[Civ. No. 10003.   Third Dist.   July 28, 1960.]

O. E. SAUGSTAD et al., Petitioners, v. SUPERIOR COURT OF PLACER COUNTY, Respondent.

Richard A. Case, Joseph P. Van Den Berg and Joseph A. DeCristoforo for Petitioners.

Stanley Mosk, Attorney General, Doris H. Maier, Deputy Attorney General, Al. B. Broyer, District Attorney, and L. J. Dewald, Deputy District Attorney, for Respondent.

VAN DYKE, P. J.—Petitioners herein seek a writ of prohibition to prevent the respondent, superior court, from proceeding with a trial based on an indictment charging them with

various crimes alleged to have arisen from the operations of the O. E. Saugstad Company (hereinafter referred to as "the company") in its conduct of a Ford dealership in Roseville, California.

The petitioners are O. E. Saugstad, the owner of the company, William Kimball, General Manager of the company, James Quirk, its Sales Manager, Peter Dimitras, Roy Lee Murphy, Salvador Carrillo, Kim Hornsby, Floyd Naylor, all salesmen, Mary Reichenau, an office employee, and one Robert Rumble.

The sales methods of the company, so far as material here, were disclosed by the witness James Ashley, who had been employed by the company in various capacities. He testified that cars were ordered from the factory and as they were readied for shipment the company would receive a production notice and thereupon a stock card would be made out for the expected car and a number assigned to it. When the car arrived a key tag would be prepared with the stock number of the car and the same number would be placed on the car itself, which was then placed on the new car sales lot.

When a prospect arrived he was waited upon by one of the salesmen who showed him the automobiles ready for sale. If he showed interest in a car the salesman would fill out upon an order blank the details of a proposed sale, which was at least tentatively satisfactory to the customer, and he would submit it to a "desk man" or a sales manager for approval. If approved, a formal contract was prepared. If disapproved, a "closer" was sent to the customer who attempted to negotiate a better deal for the company which would satisfy the customer. Finally, if a deal was arrived at a formal contract would be executed and the contract, with the stock card for that particular car and other pertinent documents, would be placed in the file and kept in the company's records.

Whenever a new car is sold the dealer is required by law to prepare a "Dealer's Report of Sale and Application for Registration of New Vehicles" on forms furnished by the Department of Motor Vehicles. The department issues these forms in so-called "books," each book containing 25 sets of triplicate forms serially numbered. The statutes and departmental regulations require that one form be sent to the department, that a duplicate form be pasted to the windshield of the car (it serves as a temporary registration receipt), and that the third copy be retained in the book with the dealer. The dealer also is required to place on or in the car a so-called paper plate to serve

until the permanent license plates are received from the department.

Frequently a car would be delivered to a purchaser before the down payment had been made, and it sometimes happened that the customer did not make the down payment. In such instances the company would either send the salesman to recover the car from the customer or get the customer to return it and the deal would be called off, the papers evidencing the deal would be cancelled and the stock card for the car returned to the inventory, with no notation on the card to indicate that the car had been previously sold. The car itself would be returned to the new car lot. If the use of the car necessitated repairs, this would be done in the company's repair shop. According to the witness Ashley, the salesman or the desk man would then return the stock card to the office where it would be kept with the other new car stock cards. Cars so returned or, as the expression went in the trade, "rolled back" were sometimes sold as new cars and a new car dealer's report of sales would be made to the department.

Petitioners first contend that the proceedings before the grand jury were unfairly conducted, but we think it unnecessary to discuss these matters since we do not deem the claimed irregularities to be of such nature as to have caused any substantial unfairness even if, as argued, better procedures could and perhaps should have been adopted.

Petitioners contend further that the indictment should be set aside because not found and presented as required by applicable statutory law and as being based on inadmissible and, therefore, incompetent and illegal evidence. Here again we do not think a detailed treatment of these contentions is necessary or would be beneficial to petitioners if made, although we have carefully examined the record with reference to these charges.

The substantial contentions of the petitioners are that the several counts in the indictment are not supported by sufficient evidence to warrant putting petitioners to their trials.

Before these proceedings were begun petitioners had moved the respondent court to set aside the indictment and that motion had been granted in part. This proceeding was then begun by petitioners and affects those counts of the indictment remaining after the action taken by the respondent court. We shall discuss only such remaining counts.

Count Three charged O. E. Saugstad, James Quirk, Mary Reichenau, Robert Rumble, William Kimball, Peter Dimitras,

Roy Lee Murphy and unknown persons with violating Penal Code, section 182, subdivision 1 (conspiracy to commit any crime), in that they conspired to defraud John F. Gadberry of his 1954 Ford automobile by causing his name to be forged to a power of attorney.

Count Four charged the same named persons with a violation of Penal Code, section 470 (forgery), by forging the name of John F. Gadberry to a power of attorney with intent to defraud him.

Count Five charged the same named persons with a violation of Penal Code, section 470, by forging the name of John F. Gadberry to an authorization for payoff with intent to defraud him.

These three counts evolve out of the sale of a 1957 Chevrolet to Fred Gadberry, the son of John F. Gadberry. Fred, a minor at the time, in November of 1959 went to the company to purchase a car. He selected a 1957 Chevrolet. He desired and offered to trade in a 1954 Ford registered in his father's name. The formal contract was written up by Murphy. Fred took delivery of the Chevrolet and turned the Ford over to the company as a down payment. Dimitras went to John's home to obtain his power of attorney to deal with the Ford car and an authorization for payoff to the bank which had the legal ownership. These documents were in blank and when Dimitras arrived at John's home he found that John was absent. He left the blank forms at John's residence, with the request they be signed and sent in. When John returned he refused to sign them because they had not been filled in. Within a short time thereafter John learned that the company had sold the Ford and he asked Quirk how this had been done without his signature authorizing a transfer. Quirk told him that the company had a power of attorney. John denied signing it and Quirk replied simply that John could do nothing about it because, as Quirk put it, "You have just got your boy's word against two of my salesmen." The completed power of attorney and authorization for payoff were introduced in evidence before the grand jury. They show that Mary Reichenau purportedly was appointed attorney in fact on the power of attorney and that John's purported signature had been witnessed by Rumble. The authorization for payoff likewise bore the purported signature of John, but it did not bear the signature of Rumble. Both John and his son, Fred, denied signing either document with the name of John Gadberry and both denied authorizing anyone to do so. A cursory examination of the signatures on

both documents discloses that in all probability one person signed John's name to both documents. It was proved that these signatures had been forged in the sense that John had signed neither of the documents.

The evidence is sufficient to support the charge of forgery, both with respect to the falsity of the signatures and the existing intent to defraud, within the meaning of that term as used in the statute defining forgery; for although there was no proof that John made any effort to recapture his car and instead permitted it to be credited on Fred's contract as a down payment, nevertheless the car was his, his consent to the transactions had never been obtained, nor had he been contacted about them; the intent was clear to use the forged documents to enable the company to sell the car for its benefit. We are concerned, however, with the sufficiency of the evidence to support the charge of a conspiracy to defraud John Gadberry and with the sufficiency of the evidence to connect all of the petitioners with the conspiracy and with the forgery.

The governing rule by which to test the evidence is stated in *Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 184 [281 P.2d 250], as follows:

"The rule governing the sufficiency of the evidence to justify a suspicion of a conspiracy has been summarized as follows: 'Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment. . . . " [I]t was not necessary for the State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct.

The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole.'' ' ' ''

From the evidence presented here it appears that over the entire course of time covered by the grand jury investigations there were two other instances in which in the sales of cars documents had been used that at least did not bear the signatures of the owners of the cars turned in and the owners in those cases testified that they had not signed the documents used. This proof, however, must be viewed against the backdrop of what appears to have been a busy dealership through which passed great numbers of automobiles and which

employed a large number of people. We think the evidence insufficient to establish anything approaching a pattern of behavior such as would afford a basis for the inference of a criminal conspiracy to commit forgery, save as to petitioner Rumble. We think the proof goes no further than to indicate isolated instances and is insufficient to support a charge of business conspiracy. Those indicted, whose names we have recited, included the owner of the business, O. E. Saugstad, the general manager, the sales manager, two salesmen, an office employee and Rumble, whose status as to the company does not appear. There is no specific proof of the participation in the actual forgery of any of the persons indicted for criminal conspiracy save Rumble, who appears to have signed as a witness to the purported signing of the power of attorney by John F. Gadberry. Whatever criminal activity the others may have been guilty of must be inferred. We think it wholly unreasonable to infer that any one of these individuals had actual knowledge that a forgery was intended and, indeed, it appears that the forging of Gadberry's name was a matter of intemperate haste rather than of necessity, for, as we have said, John Gadberry's complaint was not that his son had received credit for the turn-in value of John's Ford, but that John was angry because of the unauthorized signing of his name. We think it unreasonable to infer knowledge and participation by Saugstad, the owner of the business, or by the general manager or the sales manager or by either of the salesmen who, although interested in the completion of the sale since they were working on commission, could scarcely be charged inferentially with having joined in a conspiracy to commit the forgery or to have acted in furtherance of it. Finally, in view of this lack of necessity, we think that the evidence is wholly insufficient to support the charge against Mary Reichenau when it is considreed that she was a mere office worker who it appears was sometimes named as the attorney in fact in such powers as a matter of convenience. As to Counts Three and Four this leaves Rumble and of course Rumble cannot conspire except with another. However, it is fairly inferable, from an inspection of the documents, that some one person, other than Rumble, signed the name of John F. Gadberry; that Rumble knew this; that both knew the intended use was to accomplish the transfer of title. Rumble must stand trial, on Counts Three and Four, for forgery and conspiracy to commit it. ▮ "[O]ne person may be convicted under an indictment charging him with having con-

spired with persons unknown to the grand jury, . . . ." (11 Am.Jur., "Conspiracy," p. 560, § 26.) Count Three charged conspiracy with persons unknown.

Count Five, as heretofore stated, charged Saugstad, Quirk, Reichenau, Rumble, Kimball, Dimitras and Murphy with forgery of the authorization for payoff. What we have heretofore said demonstrates that none of these persons has been sufficiently shown to have been guilty of the forgery here charged. Rumble was not a witness to the signing of the authorization.

Count Eleven charged Saugstad, Quirk, Kimball and Carrillo with violation of Penal Code, section 182, subdivision 1, in that they conspired to violate section 20 of the Vehicle Code, which provides as follows: "It is unlawful to use a false or fictitious name, or to knowingly make any false statement or knowingly conceal any material fact in any document filed with the Department of Motor Vehicles. . . ." The overt act charged was that, pursuant to said conspiracy, the named persons on August 6, 1959, made a report of sale of a new vehicle to George McGee, although the vehicle was in fact used.

The evidence in connection with this count is as follows: Harold V. Nelson purchased a 1959 Ford wagon from the company on May 3, 1959. He signed a contract and took delivery of the car. He kept the car for a period of several weeks, drove it about 3,000 miles and then, because satisfactory financing arrangements could not be made, returned the car to the company. A report of sale was prepared on the proper forms on May 3, 1959, the date of first sale. The vehicle had an identification number of C 9 RR135984. On August 5, 1959, George McGee was shown a 1959 Ford wagon, the speedometer on which showed that the car had been driven 1,900 miles. McGee was told by the salesman that the car was a demonstrator which had been driven on dealer's plates, and dealer's report of sale of a new vehicle was prepared on August 6, 1959, by Carrillo and the identification number was given as C 9 RR135984. This document was filed with the department.

Count Fifteen charged Saugstad, Quirk, Kimball and Hornsby with a violation of Penal Code, section 182, subdivision 4, in that they conspired to obtain money or property by false pretenses from one Frank Estep by selling him a used automobile, representing it to be new.

Count Seventeen charged the same individuals named in Count Fifteen with violation of Penal Code, section 182,

subdivision 1, in that they conspired to violate the provisions of section 20 of the Vehicle Code. The overt act charged was that, pursuant to said conspiracy, the persons charged made a report of sale on July 3, 1959, of a new automobile to Frank Estep although in fact it was a used car.

The evidence pertaining to the last two counts above stated is as follows: Jack Horn testified that on February 25, 1959, he purchased a Ford Fairlane from the company. He understood that he could purchase it under a no-down payment plan. He took delivery of the car, kept it a week and drove it over 200 miles. The car was returned to the company when he was told that he would have to make a $650 down payment, which he refused to do. A report of sale was prepared on this vehicle. The identification number was B 9 RS140456. During July of 1959, Frank Estep went to the company and told the salesman he wanted to purchase a new car. He was shown one and purchased it. The report of sale filed with the Department of Motor Vehicles was of a new vehicle and showed the identification number of the new car assertedly sold to be B 9 RS140456. Hornsby was the salesman who prepared this report of sale.

Count Nineteen charged Saugstad, Quirk and Kimball with violation of Penal Code, section 182, subdivision 4, in that they conspired to obtain money or property by false pretenses from Edward Krumenacher by selling him a used car which was represented to be a new one.

Count Twenty-one charged Saugstad, Quirk and Kimball with a violation of Penal Code, section 182, subdivision 1, by conspiring to violate section 20 of the Vehicle Code by reporting the sale of a new vehicle to Edward Krumenacher, although the vehicle was a used one.

The testimony before the grand jury in regard to these last two counts disclosed that on June 29, 1959, Pablo Carrillo purchased a 1959 Ford, which he drove for 600 or 700 miles when the company took the car back under the claim that the company could not make a deal with a noncitizen, which Pablo was. A dealer's report of sale was made out on this car which was identified as number C 9 RT169017. On July 12, 1959, Edward Krumenacher purchased a 1959 Ford Custom sedan from the company. He testified the car was represented to be a new car. The dealer's report of sale filed with the Department of Motor Vehicles stated the car was sold as a new car and the identification number was given as C 9 RT169017.

Count Twenty-three charged Saugstad, Quirk, Kimball and

Naylor with a violation of Penal Code, section 182, subdivision 1, by conspiring to violate section 20 of the Vehicle Code by reporting the sale of a new vehicle to Michael Weeks, when in fact the vehicle was used.

It was shown that on June 28, 1959, Stanley Mowles purchased a 1959 Ford 4-door sedan from the company. He operated this car for a short period of time, when he was told that a mistake had been made in the contract and that he would have to pay an additional sum of money. Thereupon he returned the car and the deal was rescinded. A report of sale was prepared which indicated the identification number to be B 9 RS167743. The records of the Department of Motor Vehicles indicated the company sold a new 1959 Ford identification number B 9 RS167743 to Michael Weeks on October 24, 1959. Naylor prepared this report.

Count Thirty-one charged Saugstad, Quirk and Kimball with a violation of Penal Code, section 182, subdivision 1, by conspiring to violate section 20 of the Vehicle Code. The overt act charged was the making of a report of sale of a new vehicle to Mattie Pylican, when in fact it was used.

It appears that Claud Gray purchased a new Hillman-Minx four-door sedan on July 4, 1959, and was given possession of the car. He drove it for four or five days. He was then told that the deal was off and the company took the car back. A report of sale of a new vehicle had been prepared which showed the identification number of the car to be 1941944. On July 12, 1959, Mattie Pylican took delivery of a Hillman-Minx four-door sedan. A report of sale of new vehicle was prepared and filed with the Department of Motor Vehicles on this car. The identification number was 1941944. Mrs. Pylican operated this vehicle under paper plates for six days when this deal, too, was rescinded. She testified she was told the car was new.

Count Thirty-nine charged Saugstad, Quirk, Kimball and Murphy with violation of Penal Code, section 182, subdivision 1, by conspiring to violate section 20 of the Vehicle Code. The overt act charged was reporting the sale of a new car to Ronald Larson when in fact it was a used vehicle.

On June 5, 1959, Mayola Meadows and her husband purchased a 1959 Ford Country Sedan from the company. A report of sale of a new vehicle was prepared. This report showed the identification number to be B 9 RR179935. The Meadows kept the car six days and drove it about 450 miles. Later the deal was rescinded and the car returned to the company. On July 5, 1959, a Ford Country Sedan was sold

to Ronald B. Larson. A report of sale of a new vehicle was prepared and filed with the Department of Motor Vehicles. The identification number of the vehicle sold to Larson was B 9 RR179935. Murphy prepared the report of sale which was filed with the department.

It is clear from a recital of the evidence that it was a common practice to sell new cars, prepare a report of sale, retain it, and then if the deal did not go through recover the vehicle, return it to the new car lot and resell the car as a new car. In each instance the first purchaser had operated the vehicle. In each instance the first report of sale was not filed with the department, as required. In each instance the report of sale filed with the department was false. It would be incredulous to think that such activity could go on without the knowledge and connivance of the top officials, namely, Saugstad, Quirk and Kimball. By permitting the practice and by permitting the filing with the Department of Motor Vehicles of reports of sales of new vehicles when in fact the vehicles had been operated, the named parties formed an agreement (implied perhaps) to file documents with the department which contained false statements. From the evidence presented the grand jury could find such a conspiracy to have existed and could connect the named officials with it.

A more difficult question is whether or not a salesman who participated in an individual transaction and who prepared the report of sale can be held to have been a member of the conspiracy. While the salesmen may have "rolled back" cars and while they may have known that the stock cards would be returned to the office without a notation to the effect that the car had been returned, there is no evidence to show that the salesmen knew that any particular car had in fact been previously sold. There is nothing in the record to indicate that in filling out the report of sale a salesman was conspiring with the named officials to file a false report. As to Carrillo on Count Eleven, Hornsby on Count Seventeen, Naylor on Count Twenty-three, and Murphy on Count Thirty-nine, the petition for a writ of prohibition must be granted. The evidence of a conspiracy as to them is wholly conjectural and speculative. This is insufficient. (*Dong Haw* v. *Superior Court,* 81 Cal.App.2d 153 [183 P.2d 724].)

The evidence as to the two counts of conspiracy based upon false pretenses is sufficient to hold Saugstad, Quirk and Kimball. In each case the purchaser thought that he was purchasing a new car or a car which had only been used as a

demonstrator, when in fact each car had been sold to another person and driven by that person. The perpetration of the fraud was made possible through the method of operation practiced by the firm. By ordering the cars "rolled back" to the new car lot there was created a situation which permitted the salesman knowingly or unknowingly to perpetrate a fraud. Saugstad, Quirk and Kimball would be inferentially responsible for any false statements which contributed to the sale of the vehicles. However, as to the salesman Hornsby, who is named in Count Fifteen, there is no evidence to show that he conspired with the named individuals, and without such a showing or a showing that he knew the car sold to Estep had been used, we think that the evidence is conjectural and speculative as to him.

A writ of prohibition is granted to petitioners: Saugstad, Quirk, Kimball, Reichenau, Dimitras and Murphy as to Counts Three, Four and Five; Rumble as to Count Five; Carrillo as to Count Eleven; Hornsby as to Counts Fifteen and Seventeen; Naylor as to Count Twenty-three; and Murphy as to Count Thirty-nine. Otherwise the petitions are denied. Let a peremptory writ issue as herein adjudged. The alternative writ heretofore issued is discharged.

Schottky, J., and Warne, J. pro tem.,* concurred.

Petitioners' application for a hearing by the Supreme Court was denied September 20, 1960.

---

*Assigned by Chairman of Judicial Council.