[Crim. No. 11559. Second Dist., Div. Two. June 1, 1967.]

THE PEOPLE, Plaintiff and Appellant, v. THERESA ROY et al., Defendants and Respondents.

460

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Plaintiff and Appellant.

Russell E. Parsons for Defendants and Respondents.

FLEMING, J.—On February 5, 1965, Stella Weeks signed up for telephone answering service with RSVP Answering Service operated by Theresa Roy. In a personal talk with Mrs. Roy, Mrs. Weeks implied she was a prostitute and expressed a desire that her business calls be kept confidential, especially from the police. After some discussion about hours for calls and the handling of difficult callers, referred to as tricks, Mrs. Weeks paid a $15 deposit. As she was leaving Mrs. Roy gave her the following advice: ". . . don't get greedy, there's plenty to go around, and check the references of your guys. Don't take anybody you're not sure of. $50 or $100 is not worth it if you have to spend two or three thousand dollars and three months in jail. If you just watch your step and be extra careful, there's no problem."

On March 1 Mrs. Weeks telephoned the RSVP Answering Service, secured one call from Mrs. Roy, and voiced her

disappointment at the lack of other calls, after which the following conversation occurred:

"I said, don't you know anybody that can help me out?

"She said, I know a girl.

"Who?

"She said, Kathy Martin.

"I said, I can call her.

"She said, do you know her?

"I said no.

"She says, very good.

"I said, what is she?

"And she said, she'll give you lots of business.

"I said, oh, really?

"She said, uh-huh.

"I said, does she have a number where I can call her? Maybe I could talk—

"She said no. You call her through me.

" . . . . . . . . . . . . .

"I said all right, I'll call you tomorrow.

"And she said, don't talk about this to my other girls. I'll arrange it for you."

The next day Mrs. Weeks telephoned the RSVP Answering Service, talked to Theresa Roy and, after a pause, was connected by Mrs. Roy to Kathy Martin.

Miss Martin said she was completely undressed and expecting company and to telephone back later.

That afternoon Mrs. Weeks again telephoned Mrs. Roy at RSVP and, after some delay, was put through by Mrs. Roy to Kathy Martin, at which time the following conversation occurred:

"I said, things have been kind of slow and she suggested that maybe I get together with you and talk about some business.

"She said, yeah. She said, oh, my, how am I supposed to reach you?

"I said, well, I'm kind of on a will-call basis still with Terry—you know, Theresa."

Business terms were discussed as follows:

"I said, you know? What's the percentage, anyway? What's the deal?

"She said, well, it works on a 60-40.

"I said, 60-40?

"She said, or a trade, but you said you don't have too much business right now?

"I said, no, or actually I'm just kind of just been on the board recently, so you know, you have to give your number out and that takes a little time, but I don't like to wait too long.

"She said, nobody does. You need the money."

There followed a long conversation about some out-of-towners coming to town for a couple of nights:

"Miss Martin said, the thing is with these people coming in towards the end of the week I'd like to see you first, she said, I would like to see you and talk to you."

A meeting was arranged for the next afternoon at the cafe of the Hotel Continental.

On March 3 Mrs. Weeks telephoned Miss Martin through Mrs. Roy to cancel the appointment at the Hotel Continental and arrange a meeting for the following week. The appointment was never kept, for, unknown to Mrs. Roy and Kathy Martin, Mrs. Weeks was an undercover policewoman.

On April 1 the police arrested Theresa Roy on the premises of RSVP Answering Service, and seized a listing card from the board marked Kathy Martin and an address book giving Kathy Martin's name, address, and telephone number. The same day a deputy sheriff arrested defendant Kathy Martin at the address shown on the RSVP listing card and address book, an address which contained the telephone listed by the answering service for Kathy Martin. After she had been warned of her constitutional rights, Kathy Martin said she had been working at that location as a prostitute for the last few months and had been using the RSVP Answering Service. She had two lines, one a straight line and one that went through the RSVP board. A looseleaf notebook was seized on the premises and identified as a trick book, that is to say a directory of a prostitute's customers.

Theresa Roy and Kathy Martin were indicted for conspiring to commit the crime of prostitution, and six overt acts were charged, including Theresa Roy's conversation with Stella Weeks on February 5; Theresa Roy's introduction of Stella Weeks to Kathy Martin on March 2; Kathy Martin's conversation with Stella Weeks on the same day; and Theresa Roy's introduction of Stella Weeks to Kathy Martin on March 3.

On defendants' motion the trial court set aside the indictment as having been returned without probable cause (Pen. Code, § 995). The People have appealed.

*Identification of the Conspirators*

Apparently the dismissal was based on the theory that there had been insufficient evidence of the identity of Kathy Martin as the person who conspired with Theresa Roy to commit the crime of prostitution. On this point we think it helpful to consider the evidence separately against each defendant.

With respect to Theresa Roy, there was evidence that while operating RSVP Answering Service she referred a supposed prostitute to a woman designated as Kathy Martin as a source of business. There is evidence that the woman using the name Kathy Martin undertook to furnish customers to the supposed prostitute and that business arrangements were negotiated and a meeting arranged between them. Theresa Roy was indicted for conspiring with another to commit prostitution. If we forget the name Kathy Martin and assume an indictment charging Theresa Roy with conspiring with an unknown Madame X, still such an indictment would be valid, for one individual may be indicted for conspiring with a person or persons unknown. The rule is summarized in 1 Witkin, California Crimes (1963) p. 105: ". . . a single defendant may be charged with and tried for conspiring with C, an unapprehended coconspirator, or for conspiring with X and U, unknown and unidentified coconspirators." Further statements of the rule are found in *People* v. *Richards*, 67 Cal. 412, 416, 419 [7 P. 828, 56 Am.Rep. 716]; *People* v. *Sagehorn*, 140 Cal.App.2d 138, 146 [294 P.2d 1062]; and *Saugstad* v. *Superior Court*, 183 Cal.App.2d 277, 283, 284 [6 Cal.Rptr. 580], in which it is said: " '[O]ne person may be convicted under an indictment charging him with having conspired with persons unknown to the grand jury . . .' " See also 91 A.L.R.2d 700, 723 et seq. An indictment against Theresa Roy for conspiring with one whose name was unknown would have been valid; the present indictment is rendered no less valid because it has given the presumed name of the other conspirator.

 With respect to the indictment of Kathy Martin (indicted under that name but whose true name is Florinda West), we have evidence of a profit-sharing agreement between Stella Weeks, a supposed prostitute, and a person using the name Kathy Martin, who were put in touch with each other by Theresa Roy. The name Kathy Martin was known to the police from prior arrest records for prostitution. The defendant Kathy Martin was arrested on premises whose address and telephone number were listed with RSVP

Answering Service under the name Kathy Martin. A trick book was found there. After her arrest Kathy Martin admitted she had been working as a prostitute at that address and had been using RSVP Answering Service for her calls. These circumstances provided sufficient evidence to identify Kathy Martin, known and admitted prostitute, arrested at the address containing the telephone listed with RSVP Answering Service, with Kathy Martin, the person placed on the telephone line by Mrs. Roy, who agreed to refer customers to Mrs. Weeks, a supposed prostitute, for a percentage of the take. **[3]** A jury could reasonably infer identity of the person from identity of the name. (Code Civ. Proc., § 1963, subd. 25; Evid. Code, § 12; Witkin, Cal. Evidence (1958) § 371.) Whether this deduction is considered a presumption as it was under the old law, or an inference as it is under the new, it provides a sufficient basis from which to conclude that the Kathy Martin who talked on the telephone to Stella Weeks was the same Kathy Martin who was a known and admitted prostitute, listed with RSVP Answering Service, and arrested on April 1.

The rule is summarized in *People* v. *Horace,* 127 Cal.App. 2d 366, 369 [273 P.2d 923]: ''In *People* v. *Lorraine,* 28 Cal.App.2d 50, 54 [81 P.2d 1004], cited by appellant, it is said, 'The identity of the person may be established by proof of recognition of his voice, *or by other circumstances which satisfactorily indicate the identity of the individual.*' [Emphasis by the court.] (See also *Eastman* v. *Means,* 75 Cal.App. 537 [247 P. 1089]; 71 A.L.R. 5, note.)'' The rule was applied in *People* v. *McGaughran,* 197 Cal.App.2d 6, 16 [17 Cal.Rptr. 121], where the court said: ''Defendant also contends that because Donna's father had never before heard defendant's voice over the phone there was no foundation for the admission of the conversation with defendant. However, that fact alone would not prevent its admission. A foundation may be laid by circumstances and the contents of the conversation itself.''

 There was sufficient proof of identity to support the indictment of the defendant Kathy Martin on a charge of conspiring with Theresa Roy to commit the crime of prostitution.

### Proof of the Conspiracy Charged

Do the facts at the preliminary hearing sufficiently make out a charge of conspiracy between Theresa Roy and Kathy Martin to commit prostitution? It is argued that performance

of a legal act, such as operating a telephone answering service, cannot by itself amount to participation in an unlawful conspiracy, a proposition with which we have no quarrel, that the evidence is insufficient to establish Theresa Roy's participation in any profit-sharing arrangement between Mrs. Weeks and Kathy Martin, that there is no direct evidence of any conspiracy between Theresa Roy and Kathy Martin to take any particular action or to achieve any particular result.

We think this approach takes too restricted a view of the law of conspiracy and fails to take into account the basic nature of a conspiracy. "Conspire," said Lord Campbell, "is nothing; agreement is the thing." (*Regina* v. *Hamp* (1852) 6 Cox C.C. 167, 172.) ■ A person becomes a conspirator by agreeing to participate in an illegal enterprise. The agreement may be tacitly arrived at, and proof of its arrival may be inferred. (*People* v. *Steccone,* 36 Cal.2d 234, 238 [223 P.2d 17]; *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 57 [216 P.2d 859]; *People* v. *Yeager,* 194 Cal. 452, 484 [229 P. 40]; *People* v. *Donnolly,* 143 Cal. 394, 398 [77 P. 177].) In the case at bench there is direct testimony that Theresa Roy undertook to further Mrs. Weeks' supposed activity in the business of prostitution. Theresa Roy, after having advised Mrs. Weeks the precautions she should take in conducting her business as a prostitute (advice which standing alone we would not consider sufficient to make her a participant in a conspiracy) later went beyond the mere tender of general advice and became a collaborator in promoting the success of the supposed business venture. (*Direct Sales Co.* v. *United States,* 319 U.S. 703 [87 L.Ed. 1674, 63 S.Ct. 1265].) ■ Specifically, she promised to introduce Mrs. Weeks to someone who would give her lots of business, and later made good her promise by putting Mrs. Weeks in touch with Kathy Martin on March 2 and again on March 3. Thereafter, detailed arrangements for the splitting of business, the division of fees, and for specific deals were discussed by Mrs. Weeks and Kathy Martin. The agreement which may be inferred from this evidence is one under which Roy agreed to vouch for and introduce Weeks to Martin for the purpose of securing customers for prostitution; Martin, a prostitute with a surplus of customers, agreed to refer her excess clientele to Weeks for a fee; and Weeks ostensibly agreed to prostitute herself to service these customers. The crime of conspiracy was thus complete. More direct evidence of a conspiracy to

break the law, absent a participant turning state's witness, is rarely found.

Had Theresa Roy restricted her activities to the operation of a telephone answering service, even with knowledge that some of her customers were prostitutes who used her service to further their business, we agree that she could not have been charged with conspiracy to commit prostitution. Such was the situation in a companion case we decide today, *People* v. *Lauria, post,* p. 471 [59 Cal.Rptr. 628], in which a similar charge was brought against the operator of a telephone answering service but whose active participation in the business of prostitution was not established. By contrast Theresa Roy undertook to arrange the sharing of customers between prostitutes, and thus made herself an accessory to their business and a party to an unlawful agreement. Perhaps she was motivated solely by a desire to further the welfare and serve the interest of her customers and acted without thought of added profit for herself. But disinterested loyalty and devotion to the patrons of her service provide no excuse for the promotion of a criminal enterprise. Perhaps she was induced to stray from the path of virtue by importunities which appealed to her sympathetic nature. But considerations of entrapment are matters for affirmative defense and can not justify the dismissal of an indictment before trial. (*People* v. *Braddock,* 41 Cal.2d 794, 803 [264 P.2d 521] ; *People* v. *Benford,* 53 Cal.2d 1, 11 [345 P.2d 928] ; cf. *People* v. *Malki,* 181 Cal.App.2d 118, 122 [5 Cal.Rptr. 207].)

Part of the confusion between the operation of a legitimate business and participation in an illegal conspiracy may have been caused by the fact that two separate activities were involved : (1) the legitimate business of operating a telephone answering service, for which Mrs. Roy could not have been prosecuted, and (2) the illegitimate business of customer allocation among prostitutes. Mrs. Roy made herself a participant in the latter business by referring one supposed prostitute to another for the explicit purpose of securing customers. By no stretch of the imagination does the making of arrangements for the referral of overflow business from one prostitute to another have anything to do with the legitimate operation of a telephone answering service. The mischief for which Mrs. Roy was indicted had thus been divorced from the operation of the telephone answering service and become a separate venture of its own, even though some of its acts were derived from and dependent upon the use of facilities of the legitimate business.

In the separation of the two activities we find significant Mrs. Roy's advice to Mrs. Weeks that the latter should not discuss matters with other girls on the switchboard but should deal with her direct. Legitimate operation of a telephone answering service in no sense provides immunity from prosecution for side ventures of a criminal nature, any more than it would in the way a taxicab driver, bellhop, headwaiter, bartender, hotel clerk, or any other person using the facilities of his occupation to procure customers for prostitutes.

A criminal conspiracy, of course, may be consummated through performance of acts wholly legal in themselves. The case of *Lutwak* v. *United States*, 344 U.S. 604 [97 L.Ed. 593, 73 S.Ct. 481] is illustrative of the way in which legitimate and illegitimate activities may parallel each other. There petitioners were convicted of a conspiracy to defraud the United States by obtaining the illegal entry of three aliens as spouses of honorably discharged veterans. They had conspired to have three veterans journey to Paris, go through a marriage ceremony with three aliens, and obtain their entry into the United States under the War Brides Act. The court held the charge of criminal conspiracy to have been made out, even though the marriages in Paris were wholly legal and valid on their face. It was not the trip to Paris nor the marriages in Paris which were criminal but the agreement of the conspirators to perpetrate a fraud upon the United States.

Introducing one prostitute to another to facilitate the sharing of custom can have no legitimate function or purpose. The case thus falls within the rule of *People* v. *McLaughlin*, 111 Cal.App.2d 781 [245 P.2d 1076], where the furnishing of wire service information having no other use than to service the illegal operations of bookmakers, made the defendants knowing and intentional participants in a criminal conspiracy to further bookmaking.

The order setting aside the indictment is reversed.

Herndon, J., concurred.

ROTH, P. J.—I dissent.

The offense here charged is that Theresa Roy conspired with Kathy Martin. The indictment charges: "That on or about the 1st day of April, 1965, and for a three year period immediately preceding April 1, 1965, at and in the County . . . defendants,

468

did . . . feloniously conspire, . . . and agree together to commit the crime of Prostitution in violation of Section 647b of the Penal Code . . . in violation of Section 182.1, and did in the course of, . . . said conspiracy, . . . commit the following overt acts. . . .''

Appellants rely on the case of *De Mond* v. *Superior Court*, 57 Cal.2d 340, 344 [19 Cal.Rptr. 313, 368 P.2d 865], apparently for the proposition that '' 'An indictment will not be set aside . . . if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' ''

The charge at bench is a conspiracy between Roy and Martin. The evidence, however, shows no conversation, contact or act between Roy and Martin, either before or after any of the overt acts charged, from which any rational ground can be deduced upon which an agreement between Roy and Martin to commit the crime of prostitution can be bottomed. The only evidence in the record which by strained inference may suggest such a conspiracy is that Roy, without Martin's knowledge, put Weeks in touch with Martin, and the hearsay statement of Weeks to Martin ''. . . I'm . . . still with Terry—you know, Theresa.''

All the overt acts charged mean nothing and suggest nothing other than that Roy, the operator of the switchboard, knew some of her patrons were prostitutes and knew that Martin was a prostitute, and that Weeks contacted Martin for the ostensible purpose of making an agreement with Martin to handle some of Martin's patrons.

Weeks, the policewoman, represented to Roy she suffered from lack of patrons. Roy told Weeks that she knew a girl (Kathy Martin) who received many calls and told Weeks, so far as the record shows, without the knowledge of Martin, to get in touch with Martin and try to arrange with Martin to take care of some of her customers. This conversation between Roy and Weeks might be a conspiracy between Roy and Weeks, but it is not the conspiracy charged. Three sentences, all hearsay as to Roy, culled from three admittedly long telephone conversations between Weeks and Martin, are all there is to show a conspiracy between Roy and Martin.

''I said, things have been kind of slow and she suggested that maybe I get together with you and talk about some business.

"She said, yeah. She said, oh, my, how am I supposed to reach you?

"I said, well, I'm kind of on a will-call basis still with Terry—you know, Theresa."

There is no evidence, or even a remote suggestion of any kind, of anything that occurred between Roy and Martin at any time which shows that Martin knew she had been suggested to Weeks by Roy as a source of business or that Roy and Martin at any time had a conversation in respect of doing something for Weeks, or that Martin had indicated to Roy at any time that she would like to have Roy suggest to her the name of one of her patrons who could help her with her business.

There is nothing to show or even remotely suggest what brought Weeks and Martin together at any time or that when Roy put the Weeks call through to Martin, Roy introduced Weeks to Martin over the phone, or otherwise, or talked to Martin at all before or after the first telephone conversation, or any of the telephone conversations. In fact, the very evidence excerpted by the majority and the whole record shows the contrary.

The three sentences above quoted almost demonstrate that Roy had *never spoken to Martin* about Weeks. If Roy had, Martin would not have found it necessary to say to Weeks ". . . how am I supposed to reach you. . . ." She would have known without saying anything on the subject that all she had to do was call Roy or the Roy switchboard, as those arrangements would have been already made.

In *People* v. *Steccone,* 36 Cal.2d 234, cited by the majority, the court says at page 238 [223 P.2d 77] : ". . . before evidence of the acts and declarations of an alleged coconspirator is admissible against the other, the fact of the conspiracy must be proved." At bench there is no evidence except the hearsay declaration of a policewoman posing as a prostitute and the hearsay shows not that there was an agreement between Roy and Martin but the contrary.

In *People* v. *Long,* 7 Cal.App. 27, cited by *Steccone, supra,* the court says at page 33 [93 P. 387] : "The admission of the statement made by the Boland woman to the witness Fletcher was error. There was no evidence of any conspiracy between defendant and the woman. Conspiracies cannot be established by suspicions. There must be some evidence. Mere association does not make a conspiracy. There must be evidence of some

participation or interest in the commission of the offense. Neither was her statement a part of the *res gestae*.''

So in the case at bench, there is nothing but the answer of Weeks to Martin's query of how to get in touch—''. . . I'm kind of on a will-call basis still with Terry—you know, Theresa'' to prove an agreement to conspire between Roy and Martin. On the facts of this case the language of the court in *People* v. *James*, 189 Cal.App.2d 14, at pp. 15 and 16 [10 Cal.Rptr. 809, 91 A.L.R.2d 697], is peculiarly appropriate: ''. . . There can be no question but that there must be a degree of dependent criminality between coconspirators to violate a criminal statute in order for a conviction to stand. In other words, the guilt of both must concur in order to establish the guilt of either. In the early case of *People* v. *Richards*, 67 Cal. 412, 413 [7 P. 828, 56 Am.Rep. 716], the court held that: 'No one can dispute, or ever has disputed, that the offense cannot be committed by one alone . . .' (See also *People* v. *Miller*, 82 Cal. 107 [22 P. 924]; *People* v. *MacMullen*, 134 Cal.App. 81 [24 P.2d 794].)

''In amplification of the rule above enunciated, the court in the *MacMullen* case at page 82, held that: '. . . it is the law that on a charge of conspiracy even though but one person is indicted, the statement of the offense in the indictment must show that two or more persons, even though the other person or persons are unknown, did in fact conspire together to commit the crime. Upon a trial for the offense the evidence must show that at least two of the persons named in the charging part of the indictment committed the offense because the gist of the offense is the conspiracy. If these elements are not present then a conviction cannot be had.' ''

The record undoubtedly establishes that Roy knew some of her patrons were prostitutes and that Kathy Martin was a prostitute and used the Roy switchboard. This background does not furnish rational ground here anymore than it does in *Lauria* (filed concurrently herewith) for assuming the possibility of a conspiracy between Roy and Martin to help Weeks. All the record shows to me is that Roy, the owner of the telephone service, in an effort to keep a policewoman, posing as a prostitute, as a customer, undertook to help the policewoman get some business in her simulated occupation by suggesting that she get in touch with an affluent courtesan, without the knowledge of the courtesan, who is made a party to the conspiracy.

My learned brother who authored *Lauria* says ''When the

intent to further and promote the criminal enterprise comes from the lips of the supplier himself, ambiguities of inference from circumstance need not trouble us.''

They trouble me because the record as pointed out shows no contact of any kind and nothing coming ''. . . from the lips . . .'' of Roy to Martin.

The gratuitous conduct on the part of Roy does not, in my opinion, make a felon of Martin nor does it on the indictment before us make a felon of Roy.

The indictment was properly dismissed.

The petition of respondent Roy for a hearing by the Supreme Court was denied July 26, 1967. Peters, J., was of the opinion that the petition should be granted.