[Crim. No. 11661. Second Dist., Div. Two. June 1, 1967.]

THE PEOPLE, Plaintiff and Appellant, v. LOUIS LAURIA et al., Defendants and Respondents.

472

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood and Robert J. Lord, Deputy District Attorneys, for Plaintiff and Appellant.

Jay Plotkin, under appointment by the Court of Appeal, Patrick Coleman, Apple & Dobrin and Irving D. Apple for Defendants and Respondents.

FLEMING, J.—In an investigation of call-girl activity the police focused their attention on three prostitutes actively plying their trade on call, each of whom was using Lauria's telephone answering service, presumably for business purposes.

On January 8, 1965, Stella Weeks, a policewoman, signed up for telephone service with Lauria's answering service. Mrs. Weeks, in the course of her conversation with Lauria's office manager, hinted broadly that she was a prostitute concerned with the secrecy of her activities and their concealment from the police. She was assured that the operation of the service was discreet and "about as safe as you can get." It was arranged that Mrs. Weeks need not leave her address with the answering service, but could pick up her calls and pay her bills in person.

On February 11, Mrs. Weeks talked to Lauria on the telephone and told him her business was modelling and she had been referred to the answering service by Terry, one of the three prostitutes under investigation. She complained that because of the operation of the service she had lost two valuable customers, referred to as tricks. Lauria defended his service and said that her friends had probably lied to her about having left calls for her. But he did not respond to Mrs. Weeks' hints that she needed customers in order to make money, other than to invite her to his house for a personal visit in order to get better acquainted. In the course of his talk he said "his business was taking messages."

On February 15, Mrs. Weeks talked on the telephone to Lauria's office manager and again complained of two lost calls, which she described as a $50 and a $100 trick. On investigation the office manager could find nothing wrong, but she said she would alert the switchboard operators about slip-ups on calls.

On April 1 Lauria and the three prostitutes were arrested. Lauria complained to the police that this attention was undeserved, stating that Hollywood Call Board had 60 to 70 prostitutes on its board while his own service had only 9 or 10, that he kept separate records for known or suspected prostitutes for the convenience of himself and the police. When asked if his records were available to police who might come

to the office to investigate call girls, Lauria replied that they were whenever the police had a specific name. However, his service didn't "arbitrarily tell the police about prostitutes on our board. As long as they pay their bills we tolerate them." In a subsequent voluntary appearance before the grand jury Lauria testified he had always cooperated with the police. But he admitted he knew some of his customers were prostitutes, and he knew Terry was a prostitute because he had personally used her services, and he knew she was paying for 500 calls a month.

Lauria and the three prostitutes were indicted for conspiracy to commit prostitution, and nine overt acts were specified. Subsequently the trial court set aside the indictment as having been brought without reasonable or probable cause. (Pen Code, § 995.) The People have appealed, claiming that a sufficient showing of an unlawful agreement to further prostitution was made.

██ To establish agreement, the People need show no more than a tacit, mutual understanding between coconspirators to accomplish an unlawful act. (*People* v. *Calhoun,* 50 Cal.2d 137, 144 [323 P.2d 427]; *People* v. *Yeager,* 194 Cal. 452, 484 [229 P. 40].) Here the People attempted to establish a conspiracy by showing that Lauria, well aware that his codefendants were prostitutes who received business calls from customers through his telephone answering service, continued to furnish them with such service. This approach attempts to equate knowledge of another's criminal activity with conspiracy to further such criminal activity, and poses the question of the criminal responsibility of a furnisher of goods or services who knows his product is being used to assist the operation of an illegal business. Under what circumstances does a supplier become a part of a conspiracy to further an illegal enterprise by furnishing goods or services which he knows are to be used by the buyer for criminal purposes?

The two leading cases on this point face in opposite directions. In *United States* v. *Falcone,* 311 U.S. 205 [85 L.Ed. 128, 61 S.Ct. 204], the sellers of large quantities of sugar, yeast, and cans were absolved from participation in a moonshining conspiracy among distillers who bought from them, while in *Direct Sales Co.* v. *United States,* 319 U.S. 703 [87 L.Ed. 1674, 63 S.Ct. 1265], a wholesaler of drugs was convicted of conspiracy to violate the federal narcotic laws by selling drugs in quantity to a codefendant physician who was supplying them to addicts. The distinction between these two

cases appears primarily based on the proposition that distributors of such dangerous products as drugs are required to exercise greater discrimination in the conduct of their business than are distributors of innocuous substances like sugar and yeast.

In the earlier case, *Falcone*, the sellers' knowledge of the illegal use of the goods was insufficient by itself to make the sellers participants in a conspiracy with the distillers who bought from them. Such knowledge fell short of proof of a conspiracy, and evidence on the volume of sales was too vague to support a jury finding that respondents knew of the conspiracy from the size of the sales alone.

In the later case of *Direct Sales*, the conviction of a drug wholesaler for conspiracy to violate federal narcotic laws was affirmed on a showing that it had actively promoted the sale of morphine sulphate in quantity and had sold codefendant physician, who practiced in a small town in South Carolina, more than 300 times his normal requirements of the drug, even though it had been repeatedly warned of the dangers of unrestricted sales of the drug. The court contrasted the restricted goods involved in *Direct Sales* with the articles of free commerce involved in *Falcone*: ''All articles of commerce may be put to illegal ends,'' said the court. ''But all do not have inherently the same susceptibility to harmful and illegal use. . . . This difference is important for two purposes. One is for making certain that the seller knows the buyer's intended illegal use. The other is to show that by the sale he intends to further, promote, and cooperate in it. This intent, when given effect by overt act, is the gist of conspiracy. While it is not identical with mere knowledge that another purposes unlawful action it is not unrelated to such knowledge. . . . The step from knowledge to intent and agreement may be taken. There is more than suspicion, more than knowledge, acquiescence, carelessness, indifference, lack of concern. There is informed and interested cooperation, stimulation, instigation. And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy.'' (319 U.S. at pp. 710-713, 87 L.Ed. at pp. 1681, 1682.)

While *Falcone* and *Direct Sales* may not be entirely consistent with each other in their full implications, they do provide us with a framework for the criminal liability of a supplier of lawful goods or services put to unlawful use. ■ Both the element of *knowledge* of the illegal use of the

goods or services and the element of *intent* to further that use must be present in order to make the supplier a participant in a criminal conspiracy.

Proof of *knowledge* is ordinarily a question of fact and requires no extended discussion in the present case. The knowledge of the supplier was sufficiently established when Lauria admitted he knew some of his customers were prostitutes and admitted he knew that Terry, an active subscriber to his service, was a prostitute. In the face of these admissions he could scarcely claim to have relied on the normal assumption an operator of a business or service is entitled to make, that his customers are behaving themselves in the eyes of the law. Because Lauria knew in fact that some of his customers were prostitutes, it is a legitimate inference he knew they were subscribing to his answering service for illegal business purposes and were using his service to make assignations for prostitution. On this record we think the prosecution is entitled to claim positive knowledge by Lauria of the use of his service to facilitate the business of prostitution.

The more perplexing issue in the case is the sufficiency of proof of *intent* to further the criminal enterprise. The element of intent may be proved either by direct evidence, or by evidence of circumstances from which an intent to further a criminal enterprise by supplying lawful goods or services may be inferred. Direct evidence of participation, such as advice from the supplier of legal goods or services to the user of those goods or services on their use for illegal purposes, such evidence as appeared in a companion case we decide today, *People* v. *Roy, ante,* p. 459 [59 Cal.Rptr. 636], provides the simplest case. When the intent to further and promote the criminal enterprise comes from the lips of the supplier himself, ambiguities of inference from circumstance need not trouble us. But in cases where direct proof of complicity is lacking, intent to further the conspiracy must be derived from the sale itself and its surrounding circumstances in order to establish the supplier's express or tacit agreement to join the conspiracy.

In the case at bench the prosecution argues that since Lauria knew his customers were using his service for illegal purposes but nevertheless continued to furnish it to them, he must have intended to assist them in carrying out their illegal activities. Thus through a union of knowledge and intent he became a participant in a criminal conspiracy. Essentially, the People argue that knowledge alone of the continuing use of

his telephone facilities for criminal purposes provided a sufficient basis from which his intent to participate in those criminal activities could be inferred.

In examining precedents in this field we find that sometimes, but not always, the criminal intent of the supplier may be inferred from his knowledge of the unlawful use made of the product he supplies. Some consideration of characteristic patterns may be helpful.

██ 1. Intent may be inferred from knowledge, when the purveyor of legal goods for illegal use has acquired a stake in the venture. (*United States* v. *Falcone,* 109 F.2d 579, 581.) For example, in *Regina* v. *Thomas,* [1957] 2 All Eng. 181, 342, a prosecution for living off the earnings of prostitution, the evidence showed that the accused, knowing the woman to be a convicted prostitute, agreed to let her have the use of his room between the hours of 9 p.m. and 2 a.m. for a charge of £3 a night. The Court of Criminal Appeal refused an appeal from the conviction, holding that when the accused rented a room at a grossly inflated rent to a prostitute for the purpose of carrying on her trade, a jury could find he was living on the earnings of prostitution.

In the present case, no proof was offered of inflated charges for the telephone answering services furnished the codefendants.

██ 2. Intent may be inferred from knowledge, when no legitimate use for the goods or services exists. The leading California case is *People* v. *McLaughlin,* 111 Cal.App.2d 781 [245 P.2d 1076], in which the court upheld a conviction of the suppliers of horse-racing information by wire for conspiracy to promote bookmaking, when it had been established that wire-service information had no other use than to supply information needed by bookmakers to conduct illegal gambling operations.

In *Rex* v. *Delaval* (1763) 3 Burr. 1434, 97 Eng.Rep. 913, the charge was unlawful conspiracy to remove a girl from the control of Bates, a musician to whom she was bound as an apprentice, and place her in the hands of Sir Francis Delaval for the purpose of prostitution. Lord Mansfield not only upheld the charges against Bates and Sir Francis, but also against Fraine, the attorney who drew up the indentures of apprenticeship transferring custody of the girl from Bates to Sir Francis. Fraine, said Lord Mansfield, must have known that Sir Francis had no facilities for teaching music to ap-

prentices so that it was impossible for him to have been ignorant of the real intent of the transaction.

In *Shaw* v. *Director of Public Prosecutions,* [1962] A.C. 220, the defendant was convicted of conspiracy to corrupt public morals and of living on the earnings of prostitution, when he published a directory consisting almost entirely of advertisements of the names, addresses, and specialized talents of prostitutes. Publication of such a directory, said the court, could have no legitimate use and serve no other purpose than to advertise the professional services of the prostitutes whose advertisements appeared in the directory. The publisher could be deemed a participant in the profits from the business activities of his principal advertisers.

Other services of a comparable nature come to mind: the manufacturer of crooked dice and marked cards who sells his product to gambling casinos; the tipster who furnishes information on the movement of law enforcement officers to known lawbreakers. (Cf. *Jackson* v. *State of Texas* (1957) 164 Tex. Crim. Rep. 276 [298 S.W.2d 837], where the furnisher of signaling equipment used to warn gamblers of the police was convicted of aiding the equipping of a gambling place.) In such cases the supplier must necessarily have an intent to further the illegal enterprise since there is no known honest use for his goods.

However, there is nothing in the furnishing of telephone answering service which would necessarily imply assistance in the performance of illegal activities. Nor is any inference to be derived from the use of an answering service by women, either in any particular volume of calls, or outside normal working hours. Night-club entertainers, registered nurses, faith healers, public stenographers, photographic models, and free lance substitute employees, provide examples of women in legitimate occupations whose employment might cause them to receive a volume of telephone calls at irregular hours.

 3. Intent may be inferred from knowledge, when the volume of business with the buyer is grossly disproportionate to any legitimate demand, or when sales for illegal use amount to a high proportion of the seller's total business. In such cases an intent to participate in the illegal enterprise may be inferred from the quantity of the business done. For example, in *Direct Sales, supra,* the sale of narcotics to a rural physician in quantities 300 times greater than he would have normal use for provided potent evidence of an intent to further the illegal activity. In the same case the court also found

significant the fact that the wholesaler had attracted as customers a disproportionately large group of physicians who had been convicted of violating the Harrison Act. In *Shaw* v. *Director of Public Prosecutions,* [1962] A.C. 220, almost the entire business of the directory came from prostitutes.

No evidence of any unusual volume of business with prostitutes was presented by the prosecution against Lauria.

Inflated charges, the sale of goods with no legitimate use, sales in inflated amounts, each may provide a fact of sufficient moment from which the intent of the seller to participate in the criminal enterprise may be inferred. In such instances participation by the supplier of legal goods to the illegal enterprise may be inferred because in one way or another the supplier has acquired a special interest in the operation of the illegal enterprise. His intent to participate in the crime of which he has knowledge may be inferred from the existence of his special interest.

Yet there are cases in which it cannot reasonably be said that the supplier has a stake in the venture or has acquired a special interest in the enterprise, but in which he has been held liable as a participant on the basis of knowledge alone. Some suggestion of this appears in *Direct Sales, supra,* where both the knowledge of the illegal use of the drugs and the intent of the supplier to aid that use were inferred. In *Regina* v. *Bainbridge* (1959) 3 Week.L. 656 [ (C.C.A. 6) [3 All Eng. 200, 123 J. P. 499, 43 Crim. App. 194], a supplier of oxygen-cutting equipment to one known to intend to use it to break into a bank was convicted as an accessory to the crime. In *Sykes* v. *Director of Public Prosecutions* [1962] A.C. 528, one having knowledge of the theft of 100 pistols, 4 submachine guns, and 1,960 rounds of ammunition was convicted of misprision of felony for failure to disclose the theft to the public authorities. ▮ It seems apparent from these cases that a supplier who furnishes equipment which he *knows* will be used to commit a serious crime may be deemed from that knowledge alone to have intended to produce the result. Such proof may justify an inference that the furnisher intended to aid the execution of the crime and that he thereby became a participant. For instance, we think the operator of a telephone answering service with positive knowledge that his service was being used to facilitate the extortion of ransom, the distribution of heroin, or the passing of counterfeit money who continued to furnish the service with knowledge of its use, might be chargeable on knowledge alone with participation in a scheme to extort money, to distribute narcotics, or to

pass counterfeit money. The same result would follow the seller of gasoline who knew the buyer was using his product to make Molotov cocktails for terroristic use.

Logically, the same reasoning could be extended to crimes of every description. ■ Yet we do not believe an inference of intent drawn from knowledge of criminal use properly applies to the less serious crimes classified as misdemeanors. The duty to take positive action to dissociate oneself from activities helpful to violations of the criminal law is far stronger and more compelling for felonies than it is for misdemeanors or petty offenses. In this respect, as in others, the distinction between felonies and misdemeanors, between more serious and less serious crime, retains continuing vitality. In historically the most serious felony, treason, an individual with knowledge of the treason can be prosecuted for concealing and failing to disclose it. (Pen. Code, § 38; 18 U.S.C. § 2382.) ■ In other felonies, both at common law and under the criminal laws of the United States, an individual knowing of the commission of a felony is criminally liable for concealing it and failing to make it known to proper authority. (4 Blackstone 121; *Sykes* v. *Director of Public Prosecutions* [1962] A.C. 528; 18 U.S.C. § 4.) ■ But this crime, known as misprision of felony, has always been limited to knowledge and concealment of felony and has never extended to misdemeanor. A similar limitation is found in the criminal liability of an accessory, which is restricted to aid in the escape of a principal who has committed or been charged with a *felony*. (Pen. Code, § 32.) We believe the distinction between the obligations arising from knowledge of a felony and those arising from knowledge of a misdemeanor continues to reflect basic human feelings about the duties owed by individuals to society. Heinous crime must be stamped out, and its suppression is the responsibility of all. (*Backun* v. *United States*, 112 F.2d 635, 637.) Venial crime and crime not evil in itself present less of a danger to society, and perhaps the benefits of their suppression through the modern equivalent of the posse, the hue and cry, the informant, and the citizen's arrest, are outweighed by the disruption to everyday life brought about by amateur law enforcement and private officiousness in relatively inconsequential delicts which do not threaten our basic security. The subject has been summarized in an English text on the criminal law: ''Failure to reveal a felony to the authorities is now authoritatively determined to be misprision of felony, which is a commonlaw misdemeanour;

misprision of treason is punishable with imprisonment for life. . . . No offence is committed in failing to disclose a misdemeanour. . . .

" 'To require everyone, without distinction, as to the nature and degree of the offence, to become an accuser, would be productive of inconvenience in exposing numbers to penal prosecutions, multiplying criminal charges, and engendering private dissension. It may sometimes be more convenient that offences should be passed over, than that all should indiscriminately be made the subject of prosecution; and a law would be considered to be harsh and impolitic, if not unjust, which compelled every party injured by a criminal act, and, still more so, to compel everyone who happened to know that another had been so injured, to make a public disclosure of the circumstances. Here, therefore, there is reason for limiting the law against mere misprisions to the concealment of such crimes as are of an aggravated complexion.' " (Criminal Law, Glanville Williams (2d ed.) p. 423.)

With respect to misdemeanors, we conclude that positive knowledge of the supplier that his products or services are being used for criminal purposes does not, without more, establish an intent of the supplier to participate in the misdemeanors. With respect to felonies, we do not decide the converse, viz., that in all cases of felony knowledge of criminal use alone may justify an inference of the supplier's intent to participate in the crime. The implications of *Falcone* make the matter uncertain with respect to those felonies which are merely prohibited wrongs. See also *Holman* v. *Johnson* (1775) 98 Eng.Rep. 1120 (sale and delivery of tea at Dunkirk known to be destined for smuggling into England not an illegal contract). But decision on this point is not compelled, and we leave the matter open.

From this analysis of precedent we deduce the following rule: the intent of a supplier who knows of the criminal use to which his supplies are put to participate in the criminal activity connected with the use of his supplies may be established by (1) direct evidence that he intends to participate, or (2) through an inference that he intends to participate based on, (a) his special interest in the activity, or (b) the aggravated nature of the crime itself.

When we review Lauria's activities in the light of this analysis, we find no proof that Lauria took any direct action to further, encourage, or direct the call-girl activities of his codefendants and we find an absence of circumstance from

which his special interest in their activities could be inferred. Neither excessive charges for standardized services, nor the furnishing of services without a legitimate use, nor an unusual quantity of business with call girls, are present. The offense which he is charged with furthering is a misdemeanor, a category of crime which has never been made a required subject of positive disclosure to public authority. Under these circumstances, although proof of Lauria's knowledge of the criminal activities of his patrons was sufficient to charge him with that fact, there was insufficient evidence that he intended to further their criminal activities, and hence insufficient proof of his participation in a criminal conspiracy with his codefendants to further prostitution. Since the conspiracy centered around the activities of Lauria's telephone answering service, the charges against his codefendants likewise fail for want of proof.

In absolving Lauria of complicity in a criminal conspiracy we do not wish to imply that the public authorities are without remedies to combat modern manifestations of the world's oldest profession. Licensing of telephone answering services under the police power, together with the revocation of licenses for the toleration of prostitution, is a possible civil remedy. The furnishing of telephone answering service in aid of prostitution could be made a crime. (Cf. Pen. Code, § 316, which makes it a misdemeanor to let an apartment with knowledge of its use for prostitution.) Other solutions will doubtless occur to vigilant public authorities if the problem of call-girl activity needs further suppression.

The order is affirmed.

Herndon, J., concurred.

Roth, P. J., concurred in the judgment.