[Crim. No. 2951. Fourth Dist., Div. One. June 25, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES BOOKER, Defendant and Appellant.

James Booker, in pro. per., and James E. O'Neal, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney Generals, Elizabeth Miller and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

WHELAN, J.—Defendant Booker, convicted in a jury trial of burglary and grand theft based upon a single incident, appeals from a judgment imposing sentence.

Alvin Hardy was tried jointly with defendant and convicted of grand theft and burglary.

## The Evidence

The direct testimony, physical evidence, and inferences reasonably to be drawn therefrom, stated most favorably in support of the judgment, are as follows:

On Tuesday, October 4, 1966, at about 4 p.m., Mrs. Harumi Kanemitsu made some purchases at the Food Value market in Vista, San Diego County. In making payment, she cashed a check for $320 and received 15 brand-new $20 federal reserve notes in change. They were part of a bundle of 25 such notes, all numbered in series that had been given by the owner to Glenn A. Winn, the checker clerk at one of the two check stands in the store, while Mrs. Kanemitsu waited to have the check cashed. Winn put the remaining 10 notes into the cash register of the #2 check stand at which he was stationed underneath other $20 notes already there, of which there had been at least $600 in twenties as well as $200 or more in tens.

Following the departure of Mrs. Kanemitsu, the next customer at the #2 check stand was one of three Negro men that Winn had observed together in the store as he was checking out Mrs. Kanemitsu; next in line at the #2 check stand was Mrs. Betty Edwards with a well-loaded market cart.

The man in front of Mrs. Edwards had a pint of ice cream; in ringing up that purchase, Winn caused the cash drawer of the register to open; the male customer then said that he wanted some pancake flour, which was obtained; the man then said he wanted to take some candy "to the children"; there was a case of candy bars behind Winn, to which he turned and was facing and somewhat bent toward while the man pointed out various candies and asked their prices; all that time the cash drawer was open.

Meanwhile, Booker had come up to check stand #2 and, because he carried only one item of merchandise, was invited by Mrs. Edwards to go ahead of her, which he did. At about the same time, Hardy came up behind Mrs. Edwards and to her right and engaged her in conversation, asking her advice

as to what kind of nuts he should use to make a German chocolate cake and asking her to pick out a package of nuts for him from a rack to her right, to see which she had to turn toward it. She indicated a package of nuts; while facing toward the nuts she felt a movement of her basket, which had been rolled into a position between the counter of the check stand and the cash register; Hardy finally took a 49-cent package of nuts and shoved in ahead of Mrs. Edwards.

The three men were now all alongside the counter of the check stand and paid for their purchases with metal coinage or one dollar bills.

When Winn was putting Mrs. Edwards' payment in the cash drawer, he noticed that all the $20 notes and most of the $10 notes were missing.

The total cash shortage in the store on October 4 was $1,089.73, of which a few dollars would have been cash payments for the return of bottles.

The $500 in new $20 notes was part of a total of $5,000 in such notes obtained by the store owner from First National Bank of Vista on September 30 for the purpose of taking care of the cashing of U. S. Government paychecks for people coming from the nearby Camp Pendleton United States Marine Corps Base.

The bank, in turn, had received a shipment of $20,000 in brand-new $20 notes on September 28, which it broke up into packages, each containing 50 notes, all serially numbered, divided into two smaller divisions of which 25 notes were held together by a paper clip. It was one such group of 25 notes held together by a paper clip that Clay gave to Winn on October 4. The bank made a record of the numbers of the first and last of each series of 25 notes.

Winn, after discovering the loss of the money on October 4, told Clay about it, who immediately listed the serial numbers of the remaining 25 notes of the $1,000 package, from which he had given $500 to Winn.

On Friday, October 7, Mrs. Kanemitsu came into the store again. She had with her two of the $20 notes she had received on October 4. At the request of Winn and Clay, she exchanged those notes for two others of the same denomination.

Booker, Hardy and the third man had been seen in the Vista Food Value store on another occasion shortly before October 4.

On October 4, between 2:30 and 3:30 p.m., Hardy and two other unidentified Negro men were in the food market of Carmelo Spano in Oceanside. Hardy came to the check stand of a woman clerk with a small purchase; a second of the three men pushed past Hardy and said he would pay for both of them. When the purchases were rung up he presented a $5 bill, then said he had change, produced a handful of coins which he placed on the counter as far as possible from the cash register, the drawer of which had opened when the purchases were rung up. The man with the coins was picking them over, saying he was a coin collector and wished to keep any coins with certain dates; at the same time, the third of the three men, from outside the enclosed area and to the right of one looking toward the front of the store, engaged the clerk in conversation. When the purchases were paid for from the metal coinage, the three men left. Later if was found that about $85 in notes was missing from the register. Oceanside is about 15 miles from Vista by highway.

At about 5 p.m. on October 4 in Anaheim, some 55 to 60 minutes travel time from Vista by automobile driven within legal speed limits, defendant Booker, Hardy and a third Negro man were in the Lincoln Auto Parts and Supplies shop situated within a shopping center. The shop was operated by Joel Slome, who, with two employees, was within the shop, as was a customer known to Slome.

David M. Taich, one of the employees, was in the stock room behind the sales room, from which he saw down the length of the sales room, which was 60 feet deep by 30 feet wide; saw that "Jimmy" Ellis, the other employee, was engaged in talking to Hardy, for whom Jimmy had just rung up a sale on the cash register thereby opening the cash drawer; at the same time Booker was engaged in conversation with Slome near a stack of canned motor oils, concerning which Booker was asking Slome the various weights and the reasons for different weights of oil; the customer acquaintance of Slome was at the same position as Slome and Booker; the third Negro man was at the front of the cash register. With that disposition of the persons in the shop, Taich saw the hand of the third Negro man come over and into the cash drawer and quickly withdraw; almost at that instant, Jimmy said, "Put back the money." The third man, perhaps purposely, knocked over a bottle of soft drink standing on the counter as he moved away from the register and toward the doorway; he said, "I'll pay for it, how much is it?"; Slome

said, "Never mind, just give me my money back"; Booker cried out, "Why did you do it, man? I told you not to"; the third man ran out the door, followed by Slome and his acquaintance.

As he left, Slome said to Hardy and Booker, "You stay here." As soon as Slome was out the door, Hardy and Booker left. Slome followed the third Negro man, who ran to the next corner and around it and into a parked automobile, theretofore unoccupied but with the engine running. As the fugitive ran from Slome he threw down three or four $5 bills, which Slome recovered after the fugitive had driven away. In addition to those, there was about $320 missing from the till.

Anaheim police were called to the scene. The radio information heard by them at about 5:30 p.m. was that there had been an armed robbery at the automotive supply store, with three Negro men and a green Mustang automobile involved; that one of the men wore a white shirt.

One of the police at the scene, Jerry C. Foster, was told by a man that one of the wanted men was around the corner of a commercial building along the north side of which Foster had parked his car; as Foster started toward the northeast corner, Hardy came around it and toward Foster with his arms raised. Foster arrested Hardy; then searched him, finding on his person eighteen $20 notes, twelve $10 notes, and nine $1.00 notes.

Vincent L. Howard, a motorcycle officer, went to the shopping center where he was told that two of the suspects had run south; he started in that direction and saw Booker, wearing a white shirt, 200 yards away on an overpass over a freeway; came up to Booker and asked him his name, then arrested him as a suspect for armed robbery; Jimmy Ellis then came up and identified Booker as one of those involved in the theft; thereafter Howard patted down Booker for weapons and shortly turned him over to McConnell at the scene with the information that Booker was under arrest. McConnell searched Booker's person and found a total of $465 in paper currency, consisting of eighteen $20 notes, ten $10 notes and five $1.00 notes.

Ten of the $20 notes found on Booker's person were consecutively numbered and were a part of a series of 50 numbered notes immediately preceding in series a further group of 25 consecutively numbered notes which were placed in the

#2 cash register of the Vista store after the discovery of the theft. Two other of the $20 notes on Booker's person were of a series of 25 numbers, of which one of the two notes returned by Mrs. Kanemitsu was another.

Four of the $20 notes in Hardy's possession were numbered consecutively in series next in order above the 10 consecutively numbered notes in Booker's possession. Four of the other $20 notes in Hardy's possession were consecutively numbered and were of the series of 25 of which the second note returned by Mrs. Kanemitsu on October 7 also was one.

All of those notes were within the range of the upper and lower serial numbers of the shipment of $20 notes received from the bank on September 28.

### ORDER FOR CONSOLIDATION OF TRIAL

Defendant and Hardy were charged in separate informations; the trials of both were set for the same date; on that date both cases were assigned for trial to the same department, where the prosecution immediately moved the court for a joint trial which was ordered over defendant's objection.

That ruling of the court is now attacked as an abuse of discretion because it is claimed there was received in the joint trial evidence that would have been inadmissible against defendant if he had had a separate trial.

We are of opinion that there was no abuse of discretion in the order for consolidation (*People* v. *Hidalgo,* 195 Cal.App. 2d 843 [16 Cal.Rptr. 312]); we discuss the question of the admissibility of evidence under another heading.

### EVIDENCE OF OTHER TRANSACTIONS
### THE OCCURRENCE AT OCEANSIDE

Defendant asserts that evidence of the occurrence in the market at Oceanside was inadmissible as to him because he was not identified as one of the three men involved of whom Hardy only was identified.

Since defendant was not identified, the evidence as to his presence there was purely circumstantial; such evidence, it is asserted, is never admissible when it is the sole evidence of a defendant's connection with another offense of which evidence is offered, even where proof of the other offense might be relevant under the rules of such cases as *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924], and *People* v. *Cavanaugh,* 44 Cal.2d 252 [282 P.2d 53]. *People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7], is cited in support of defendant's argument.

GENERAL RELEVANCY OF SUBJECT MATTER

The circumstances surrounding the theft at the Vista market make the crime almost a prototype of that which permits the introduction of evidence of other transactions to show intent and a common plan.

The elements requiring proof in the Vista theft are: the intent with which the person that physically took the money entered; whether the method or modus operandi required and had the cooperation of one or more other persons; whether in the latter event that nimble-fingered actor and his accomplice had planned the theft together before entering, which would have been a conspiracy.

■ Upon the trial of an accused for the commission of a particular crime, the prosecution may show as a part of its case that such crime was committed in furtherance of a conspiracy to commit a series of like or other criminal acts. (*People* v. *Schmidt*, 33 Cal.App. 426 [165 P. 555]; *People* v. *Arnold*, 199 Cal. 471 [250 P. 168].) The fact that such evidence may prove that in the furtherance of the common object of the conspiracy the accused committed other and distinct crimes does not render such evidence inadmissible. (*People* v. *Sampsell*, 104 Cal.App. 431, 438 [286 P. 434].)

■ It is clear that if there were a conspiracy, the acts of each conspirator done in furtherance of the conspiracy were the acts of all; and that to prove the existence of the conspiracy, prior and subsequent association might be shown. The fact that no conspiracy was charged does not make inadmissible evidence from which the existence of a conspiracy might be inferred.

■ Because of the time relationships between the three transactions, the possibility that there was a fourth man who was in the Oceanside store, rather than defendant, must be remote. Even if it were so, if the evidence is clear of the existence of a conspiracy of which defendant was a part, his presence or non-presence in the Oceanside affair is immaterial, and the evidence as to it would be admissible if otherwise relevant.

Considering that the theft at Vista occurred within as short a time as one-half hour of the Oceanside transaction; that the Anaheim occurrence followed almost after the minimum time required to travel from Vista to Anaheim; that Hardy was present on all three occasions; that defendant without doubt was present on two of them, the evidence is most persuasive that if the three transactions were part of a

planned series of operations, to which conclusion an inference presents itself most forcefully, then defendant was a party to the conspiracy.

Although it has been held that once the existence of a conspiracy has been established, slight evidence may suffice to connect a defendant with it (*People* v. *Serrano,* 180 Cal.App. 2d 243, 249-250 [4 Cal.Rptr. 470]), the evidence here is not slight but impressively substantial.

The relevancy of the Oceanside transaction is in the following matters: It shows that Hardy and his associates engaged in a similar transaction very shortly before the Vista theft; with slight variations improvised to meet existing circumstances, the method of the theft was similar; it also supplied evidence of a source of money to afford a possible explanation for the fact that defendant and Hardy had between them more than two-thirds of the amount of money taken at Vista.

It may be inferred from that evidence that the entry at Vista was burglarious, the result of a general scheme previously entered upon; that not only the man who took the money in Vista, but all three shared that intent; and that the method through which they carried out the scheme had been well rehearsed and formed a common plan for concerted action.

### The Anaheim Transaction

■ Defendant argues that the evidence as to defendant's connection with the Anaheim theft is questionable, that defendant indeed repudiated the theft and that his verbal statement in the store is proof that he did not agree to the theft.

Assuming that the jury might reasonably accept defendant's statement as proof of the truth of what he said, they were not bound to do so; his statement was merely one of the circumstances to consider in passing upon the question of defendant's participation. The statement at least was evidence that defendant had prior advice as to the planned theft.

There is no direct evidence that defendant intended to or did withdraw from the conspiracy.

Evidence of the Anaheim transaction is well within the declaration of *People* v. *Sampsell, supra,* 104 Cal.App. 431, 439: "[T]he common design of the criminal enterprise may extend in point of time beyond the actual commission of the act constituting the crime for which the accused is being

tried; and that consequently evidence is admissible to prove acts committed after (*Hollingshead* v *State*, 21 Okla.Cr. 306 [207 P. 104]), as well as before (*People* v. *Arnold, supra*), the perpetration of the crime for which the accused is being tried, provided, of course, that it reasonably appears that such acts were committed in furtherance of the common design of the conspiracy. And the questions as to when the design is accomplished or abandoned and whether the acts proved are a part of the design of the conspiracy are also for the jury to determine from the facts and circumstances of each case and the nature and purposes of the conspiracy. In other words, it is for the jury to say from all the evidence before it whether or not the acts committed subsequent to the commission of the crime are the ordinary and probable effect of the common design . . .''

██ Evidence was received as to the result of a search of Hardy's person following his arrest in Anaheim. The court informed the jury that such evidence could not be considered as to Booker.

The question is raised whether the reception of such evidence was prejudicial to Booker so as to indicate that he should have had a separate trial that might have avoided such prejudice.

We are of opinion that such evidence was relevant to the question of Booker's involvement in a conspiracy with Hardy and the unknown third man.

The amount of money found on Hardy's person and the values of the various notes and the serial numbers of certain of the $20 notes, when considered with those found on Booker's person, showed that each man had roughly the same amount of money, the same number of $20 notes, a possible common source of the notes with identifiable serial numbers, and that the aggregate of the amounts found on both men was roughly two-thirds of that taken in the Vista and Oceanside thefts.

██ All that would have been relevant and admissible in a separate trial of Booker, since proof of his guilt must depend upon proof of his participation in a cooperative scheme. The same is true with regard to the evidence of the Oceanside and Anaheim transactions.

No extended discussion is called for of the facts in *People* v. *Albertson*, 23 Cal.2d 550 [145 P.2d 7], upon which defendant relies. Suffice to say that the facts surrounding the crime for which defendant here was on trial and those concerning

the Oceanside and Anaheim transactions, when considered in relation to one another, meet the tests set out in *People* v. *Albertson, supra,* 23 Cal.2d 550, 578.

In the case at bar, the parallel is not with *People* v. *Albertson,* but with *People* v. *Lopez,* 60 Cal.2d 223, 236-237 [32 Cal.Rptr. 424, 384 P.2d 16]. (See also *People* v. *Wade,* 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116].)

### SUFFICIENCY OF THE EVIDENCE

Defendant argues the insufficiency of the evidence, citing such cases as *People* v. *Hill,* 77 Cal.App.2d 287 [175 P.2d 45], and *People* v. *Draper,* 69 Cal.App.2d 781 [160 P.2d 80], where there were only suspicious circumstances to support a finding of guilt.

It is necessary only to state the evidence to refute the claim that it was insufficient to support the verdict. No significance is placed upon minor contradictions in the testimony of the state's witnesses, none of which had to do with the identification of defendant. In the case at bench there is much strongly persuasive evidence of active participation by defendant in the commission of a crime that called for the cooperative efforts of several persons, including defendant.

### OTHER CLAIMED ERRORS

The People's Exhibit #2 is a chart showing in large numerals and letters the numbers of the $20 notes found on the persons of Booker and Hardy respectively and the serial numbers of the two $20 notes received back from Mrs. Kanemitsu on October 7; there were added to it by the banker who supplied new $20 notes to the Vista market the highest and lowest serial numbers of the shipment of $20 notes from which he supplied the market, and by the owner of the market the first and last serial numbers of a group of $20 notes placed in the #2 cash register after the theft.

The exhibit was identified by the first witness during the afternoon of July 24; was left fixed to a bulletin board during the afternoon; at 10 a.m. of July 25, Hardy's counsel moved that the exhibit be removed from sight until received in evidence; the motion was granted; thereafter the exhibit was displayed to other witnesses for identification of certain of its contents and was finally received in evidence without objection. It is claimed that defendant was prejudiced by having the contents of the exhibit in view of the jury before its reception into evidence. No prejudice has been shown.

Defendant claims prejudice also because the court, out of the presence of the jury, raised the amount of

Hardy's bail on the day before the case was submitted to the jury, and ordered Hardy remanded until the bail should be made. That was shortly before the noon recess. When court convened at 2 p.m., Hardy's counsel moved for a mistrial, claiming his client would be prejudiced in the eyes of the jury if it were known that he was in custody; he made no claim that until that time the jury knew anything of the matter. The court denied the motion and reduced the bail to the original amount, thus leaving Hardy at liberty. The record is devoid of any evidence that the matter ever came to the attention of any member of the jury; the present defendant made no such claim at the time. We will not presume either prejudice or error from those facts.

Judgment affirmed.

Brown (Gerald), P. J., and Nix, J. pro tem.,* concurred.

A petition for a rehearing was denied July 12, 1968, and appellant's petition for a hearing by the Supreme Court was denied August 21, 1968.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.