[Crim. No. 22652. First Dist., Div. Four. Mar. 8, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
LEONARD ALEXANDER, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Certified for publication, with the exception of parts I, III, and IV (Cal. Rules of Court, rules 976(b) and 976.1).

**COUNSEL**

James Larson and Larson & Weinberg for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Herbert F. Wilkinson and Martin S. Kaye, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CHRISTIAN, J.**—Leonard Alexander appeals from a judgment of imprisonment imposed after a jury found him guilty of conspiracy to commit murder (Pen. Code, §§ 182/187) and conspiracy to commit assault upon a prison inmate (Pen. Code, §§ 182/4501). A prior trial had resulted in jury deadlock.

On December 6, 1979, a racial riot occurred in Whitney Hall, a unit housing 250 to 300 inmates at the Soledad prison. Whitney Hall is divided into A and B wings; each wing in turn contains three tiers of cells on each side. The A and B wings are separated by outer and inner "sally ports," manned by correctional officers who regulate ingress and egress. Ordinarily inmates are not permitted to move freely between the two sides.

Whitney Hall was locked down in August 1979, following a racial incident in another part of the prison. During the locked down period, inmates were not permitted to leave their cells except for showers. In October and November, the prison authorities gradually eased the lockdown, permitting some inmates to go to prison jobs or classes. One of those granted some freedom of movement during this period was appellant, who worked as a visiting room photographer. He also served as the black representative for the B wing on the Men's Advisory Council, a body elected by the inmates to provide liaison between prisoners and staff and among the racial groups within the hall. Council members were permitted some access to each wing and on several occasions in October and November the appellant was seen speaking to inmates on both the A and B sides.

Around December 2, the authorities unlocked the A side; on December 6, B side too was unlocked. That same day, several inmates, a majority of them black, appeared in the prison yard wearing layers of extra clothing. This suggested to correctional officers that the inmates were "preparing for battle of some kind." At 3:30, Whitney Hall was opened to permit inmates in the yard to come inside. A few minutes later, an officer rang a lockup bell signifying that all inmates were to return to their cells for the purposes of a routine lockup and head count. Immediately after the lockup bell sounded, officers heard "rumbling and commotion" from the B side. They saw inmates running and jumping from the tiers trying to get out of the section. The officers immediately closed the gate between A and B in order to contain whatever was occurring. Nonetheless, chaotic fighting broke out on both sides of the hall. Many white or Mexican inmates, some of them bleeding profusely, clambered to the sally port to avoid further harm.

The officers on the scene were unable to restore order until more officers arrived with shotguns. The officers fired first into the air and later into the crowd.

Inmates then retreated into the cells, some alone, some in groups. The riot lasted approximately 40 to 45 minutes from the initial commotion on both sides following the lockup bell to the suppression through the use of shotguns. As the officers succeeded in restoring order, the sally port guards moved out into the wings. On the A side, they found inmate Forman stabbed to death in his cell. Inmates Childers and Cunningham were in the stairwell and shower areas respectively, each bleeding from multiple stab wounds. Childers soon died from his wounds. Officers searched Whitney Hall and its surroundings and found many prison-made knives, especially on the ground outside windows that had been broken.

Four inmates testified for the prosecution concerning appellant's part in the events on the B side during the riot. Inmate Lopez testified that he was housed in cell B 130, almost directly beneath appellant's cell, B 229. During the week preceding the December 6 unlock, Lopez was disturbed by frequent pounding which sounded like "metal on metal" coming from appellant's cell. On the afternoon of December 6, Lopez came in from the yard when the lockup warning bell was sounded and went to the shower. As he was emerging from the shower, he saw appellant coming in from the yard, walking in the direction of the cells. He was wearing a "dress" (i.e., nonprison) shirt. Lopez started to return to his cell. Suddenly the riot started. Lopez saw in a group several black inmates armed with knives. Among them was appellant, who had changed into his blue prison clothes and appeared to be wearing more than one layer of clothing. Lopez also recognized inmates Hightower and Lavell in the group; each appeared to be armed with a knife. The group of black inmates started moving, and Lopez headed for his own cell and locked himself in it using the deadbolt. Through his cell window he saw a large group of black inmates ("maybe 20") on the rear stairwell between the first and second tiers; most were carrying knives. Appellant, Hightower and Lavell were toward the front of the group; appellant held an S-shaped knife. Appellant stood in the stairwell talking to the others; he appeared to be directing the group. Some inmates began moving toward the front; one stabbed a Mexican inmate. Other Mexicans in the vicinity of the showers began picking up objects to use as weapons. When the prison officers eventually brought shotguns into the hall to quell the riot, about eight or nine inmates, including appellant, ran to the back window and threw out their knives. Lopez identified one of the prison-made weapons found outside the hall as the S-shaped knife carried by appellant. Chemical tests on the weapon revealed traces of human blood.

Inmates Long and Nelson testified that before the riot they were walking along the second tier with Myers, another white, in the direction of Long's cell. There were several groups of blacks on the second and third tiers. As Long, Nelson and Myers approached Long's cell, the blacks converged on them from both directions. Before Nelson could enter Long's cell, Bowden stabbed him

just below the middle of the back. Nelson looked up and saw two inmates, appellant and Wells, standing shoulder to shoulder three or four feet ahead of him, armed with prison-made knives which they held upward "in a military fashion." Behind them were about 10 to 15 other black inmates. Before Nelson was able to take shelter in Long's cell, he was stabbed by Battle in the forearm and in the side of his body.

The assailants followed Nelson into Long's cell; some were shouting, "Pull that white boy out, let's kill him, let's get him." Inmates Bowden, Battle, Harper, Lavell, Bell and possibly others, entered the cell "taking turns" stabbing Long and Myers. At one point Long and Myers propped up a mattress and attempted with little success to take cover behind it. Then some of the black inmates left the cell; Harper and Bell, however, remained. Harper said, "Kill this motherfucker." Bell walked over to Long, who was crouching beneath the mattress, and stabbed him in the head and in the left shoulder. At this time, somebody outside the door yelled, "Break," and the black inmates ran from the cell.

Inmates Guel and Stacey were also in the vicinity when Long, Myers and Nelson were stabbed. Shortly before the incident, Guel saw appellant walking along the third tier, followed by two other black inmates carrying knives. Guel walked to the stairs at the back of the hall. Then he saw a large group of black inmates gathered on the second tier. Ten to fifteen were assembled in and around Long's cell. All were dressed the same—"heavy duty denim jackets on, collars up." From his position, 20 to 30 feet away, Guel saw Lavell in B 237 stabbing Long. Guel saw four or five black inmates on the third tier moving in his direction. He took refuge in the cell of a Mexican inmate.

Stacey was talking to another inmate in B 108. He saw Battle emerge from B 237 and move quickly along the second tier in a fast walk or "stride." Then Battle "took off after" a white inmate named Floyd. Floyd was bleeding from a stab wound in his back. Floyd jumped down to the first tier and ran in the direction of the sally port. Stacey looked back to B 237 and saw Nelson and Long step out, both very bloody. Stacey assisted Nelson to the sally port. Long moved under his own power to the sally port. The sally port officers admitted the wounded men but would not let Stacey out of the section. Stacey looked for a cell in which to hide. Some black inmates on the second tier saw him; McAllister shouted, "Get that wood, get that wood." (Stacey explained that "wood" is "prison slang for white boy.") Mathis, Tresvant, Lavell and McAllister threatened and attempted to stab Stacey. Stacey fended off their initial assaults; then someone yelled, "Second tier," and the inmates broke off the attack and ran toward the back of the hall. During this commotion Stacey saw appellant standing alone by the stairwell. From the observations of several witnesses it may be inferred that it was he who had been giving directions to the rioters.

Prosecution witnesses also described events which occurred simultaneously on A side. Inmate Eaton saw a group of blacks stab to death Childers. The assailants also stabbed Eaton himself many times, telling him, "You're dead, white boy." Inmate Gelement witnessed the fatal stabbings of Childers and Forman by Williams and Parks. He also saw Parks stab Cunningham in the shower.

Appellant testified that he performed his duties as visiting room photographer until about 2:30. He went into the prison yard where he had a conversation with inmate Douglas. Appellant returned to Whitney Hall, left his camera equipment in his cell, and visited some inmates on the second and third tiers. As he was coming down from the third tier, he heard a commotion in the vicinity of B 237. He assumed it was simply a fight. Appellant continued down the stairs to the first tier. Not until a few minutes later did he realize that the commotion was turning into a riot. Appellant denied having a knife in his hand at any time during the riot, or standing with Wells in front of B 237 at the time of the assaults upon Nelson, Long and Myers. He testified that he had no knowledge of any plans to assault inmates.

I*

. . . . . . . . . . . . . . . . . . . . . . . . . .

II

Appellant contends that he was not accorded adequate discovery: The court denied disclosure of several correctional counselors' notes of interviews with inmates, refused to order the district attorney's investigator to reduce to writing his discussions with inmates, and withheld disclosure of the prosecuting attorney's notes of discussions with inmates.

### A. *Counselors' notes.*

In the weeks immediately following the riot, correctional officers interviewed about 300 inmates, including residents of both wings of Whitney Hall and of Shasta, another unit at Soledad. On behalf of the Department of Corrections and the counselors, the Attorney General asserted a limited privilege under Evidence Code section 1040 in response to defendant's discovery requests. The government waived the privilege, however, with respect to the statement of one inmate, Hibdon, because of its potentially exculpatory character. This statement was disclosed to the defense and Hibdon testified on behalf of appellant and then-codefendant Wells in the first trial. Two of these counselors testified concerning the circumstances of these interviews. Upon stipulation of the parties, the court also included in the record the transcript of

---

*See footnote, *ante,* page 647.

an *in camera* proceeding in one of the other cases containing additional testimony of the counselors. Finally, the court examined *in camera* the notes themselves, consisting of about 60 pages of manuscript. The court concluded the notes contained "nothing exculpatory that has not already been revealed." The court added, however, that there was "only one thing that might be of minor help to the defense, but I ruled that the necessity of confidentiality outweighs the necessity of disclosure because it only amounts to a minor impeaching factor of a witness who testified in this case."

A balancing test governs the disclosure of information acquired in confidence by public employees. The materials are privileged if "Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ." (Evid. Code, § 1040, subd. (b)(2).) Here, considerable testimony, both in open court and *in camera,* supports the court's determination that the government had made a persuasive showing regarding the grave dangers of revealing the notes.

The primary purpose of the inmate interviews was the restoration of order in the prison, not the development of evidence for prosecution. Indeed, the interview notes were withheld from the prosecutors as well as from defense counsel in the cases arising out of the riot. The prison authorities were concerned about the potential of renewed violence instigated by the original assailants or of acts of retaliation by white and Mexican inmates upon the blacks. They required as complete a picture as possible of the assaults in order to decide which inmates should be transferred to other units or watched with particular care in order to minimize the risk of further violence.

Each counselor felt it imperative that he maintain absolute confidentiality concerning each inmate's statements to him unless that inmate expressly relieved him from that bond. Any inmate who cooperated with prison officers in identifying the participants in these attacks, or other acts of prison violence, placed his own life in jeopardy. The notes themselves bear witness to these concerns. Some inmates (including victims) present at the stabbings refused to discuss them at all. Many were willing to discuss the assaults in general terms but unwilling to identify the participants. Finally, others confidentially provided a few names but declined to testify at all. In order to protect inmates who did furnish some information, the counselors required that each inmate remain in the interview room for 10 minutes, even if he did not speak a word. On the basis of their experience at Soledad and their familiarity with events in other prisons, the counselors expressed certainty that disclosure of the notes would result in the deaths of inmates. Further, inmates' recognition that a prison counselor's pledge of secrecy was subject to qualification would so compromise the counselors' effectiveness that they would be unable to keep a lid on future acts of violence within the prison.

■ The court properly accorded weight to the conclusions of the corrections professionals that disclosure of the counselors' notes would endanger the lives of numerous inmates—"the Department [of Corrections]'s judgment that disclosure of the information would endanger other persons, if not arbitrary or unreasonable, may constitute a sufficient basis for classifying a document as confidential and precluding its inspection." (*In re Muszalski* (1975) 52 Cal. App.3d 475, 481 [125 Cal.Rptr. 281].) This principle does not, of course, relieve the court of the responsibility of evaluating the potential benefits of disclosure to the defendant in order to determine whether, despite the risks, the "interest of justice" requires making the materials available. Here the court thoroughly reviewed the notes before concluding that they contained nothing exculpatory. Indeed, the notes contain a fair amount of material adverse to appellant, some of it more damaging than that produced by the prosecution at trial. There are references to appellant as a "head man" in the incident and indications he had foreknowledge of the attacks. A somewhat puzzling passage in the ruling is the court's allusion to an item that might be of "minor help" to the defense in impeaching a prosecution witness. There are arguably some minor differences between a few inmates' descriptions of the assaults to the counselors and their testimony on these events. Yet these discrepancies are apparently due to the fact that the trial and preliminary examination transcripts contain the prisoners' verbatim accounts as developed through questioning, whereas the counselors' notes merely paraphrase the inmates' stories in a few lines. Possibly the court was referring to the concluding comment in counselor Green's notes on inmate Gelement. "S [subject] states he will testify in court—wants discharge and out-of-state parole to Michigan." It is inconceivable, however, that any prejudice to appellant resulted from this nondisclosure, as the statement is quoted in the transcript of the previous *in camera* testimony which defense counsel was permitted to read. The court committed no error in denying discovery of the interview notes.

### B. *The investigators' oral discussions.*

Russell Dubree, an investigator with the district attorney's office, arrived at Soledad the evening of the riot. He initially gathered "as little recorded information as possible" in order to protect the safety of the inmate witnesses. Dubree spoke with prison officers Daniels, Grant, and Corda, who witnessed some of the events and participated in the restoration of control in Whitney Hall. He told the officers not to make written reports that night but to wait until the following day. He explained, "We didn't think we would get an accurate or full detailed information if they had to sit down in the condition they were in that night and compile a report." On December 17, he interviewed each of the officers and told them he would take care of submitting their "paper work" regarding the riot. He also interviewed other prison staff and inmates and asked them to identify photographs of suspected participants in the riot. On the basis

of this investigation, he prepared for the district attorney's office a written report on the incidents which that office turned over to defense counsel in advance of the preliminary hearing. The defense also received a written outline from which Dubree worked in conducting the interviews and preparing the report.

■ Appellant sought discovery of "all statements made by witnesses or other persons interviewed by D.A. investigator Russell Dubree . . . and if said interviews have not been reduced to writing then it is requested that the court enter an order that Mr. Dubree reduce such conversations to writing in detail." The court granted discovery of all notes of witness statements but refused the latter part of defendant's request, remarking, "I can't see how I can make him sit down and make a statement. I know of no authority allowing me to do so." Nothing, of course, prevented the defense from questioning Dubree concerning the contents of the discussions. Indeed, defense counsel did question Dubree at some length on this subject during the preliminary examination. In granting access to all written material collected or prepared by Dubree during the course of his investigation, the court adequately protected the defendant's rights. *In re Gary G.* (1981) 115 Cal.App.3d 629 [171 Cal.Rptr. 531] is instructive concerning the scope of the prosecution's duty to retain and disclose material evidence. "The above-mentioned guidelines do not require that rough interview notes taken by investigating officers be preserved for discovery purposes. . . .

"This is not to say that such notes are never discoverable; indeed, should such notes still be in existence at the time a discovery order is made they should be turned over as part of the overall discovery package. [Citation.] We simply refuse to impose a judicial mandate that requires in each and every instance all original notes taken during the investigatory process be retained. [Citation.] Where an officer testifies that he made an accurate report based on the interview notes and thereafter a copy of the report is given to opposing counsel, there can be no cause to complain that all required discovery materials have not been provided . . . ." (*In re Gary G., supra,* 115 Cal.App.3d 629, 640; see also *Carruthers* v. *Municipal Court* (1980) 110 Cal.App.3d 439, 441-442 [168 Cal.Rptr. 33]; *People* v. *Torres* (1971) 19 Cal.App.3d 724, 731 [97 Cal.Rptr. 139]; *United States* v. *Mills* (9th Cir. 1981) 641 F.2d 785, cert. den. 454 U.S. 902.)

Just as there is no duty to preserve all notes, there is no duty to make notes in the first place. What is essential is that the defense receive the fruits of the law enforcement authorities' investigations. Here, in addition to Dubree's written materials, the defendant was granted access to all investigative reports prepared and witness statements taken by prison staff (with the exception of the counselors' notes discussed earlier). The defense also received more conventional discovery items—photographs and other tangible evidence, criminal

records of all witnesses, and names and locations of all who provided information to the prosecution and prison authorities. The court's refusal to order the preparation of further written memoranda (or to impose sanctions on the district attorney's office for its oral investigation policy) did not deprive the defense of all pertinent information in the hands of the prosecution.

## C. *The prosecuting attorney's notes.*

Finally, appellant argues that the court should have required the prosecuting attorney to turn over all notes of his conversations with witnesses. Statements given by witnesses to the prosecutor are discoverable "since such statements constitute material of a nonderivative or noninterpretative nature." (*People v. Williams* (1979) 93 Cal.App.3d 40, 63-64 [155 Cal.Rptr. 414]; *Robinson v. Superior Court* (1978) 76 Cal.App.3d 968, 978-979 [143 Cal. Rptr. 328].) But this principle does not abrogate the attorney work product rule for the purposes of criminal discovery. "[W]ritings reflecting an attorney's impressions, conclusions, opinions, legal research or theories are absolutely barred from discovery by the work product rule. (Code Civ. Proc., § 2016, subd. (g).) Other work product is discoverable if the court determines that denial of discovery will unfairly prejudice trial preparation of the party seeking it or will result in injustice [citation]." (*People v. Moore* (1975) 50 Cal.App.3d 989, 994 [123 Cal.Rptr. 837]; see also *People v. Collie* (1981) 30 Cal.3d 43, 59-60 [177 Cal.Rptr. 458, 634 P.2d 534].) Here, the prosecutor only met with inmate witnesses after Dubree had conducted his investigation. The prosecutor described these encounters in a declaration: "The main purpose in talking to the inmate witnesses was to meet them face to face prior to putting them on the witness stand in an effort to develop a rapport with each witness and to determine if in fact they were going to testify and if so, how much of the incident they will be going to relate. . . . [¶] Prior to talking to the inmate witnesses in this case I had no assurance that any of them would actually be willing either to talk to me or to testify. Hence, in talking to them, I was more concerned with whether they would testify than exactly what they would testify to." He added that he made only "sporadic" notes during these sessions and in some none at all; those he did make were "interpretative of what I was being told"—"no attempt was made during any interview with any inmate witness to take a 'statement' from them, since it was felt that any attempt to take a statement would likely result in their refusal to talk." In urging that his notes were work product, the prosecutor contended that they "contained many conclusions and opinions about the evidence of my own." The court could reasonably conclude that, to the extent inmates made any "statements" to the authorities concerning the December 6 incident, it was Dubree and the Soledad investigators, such as Lt. Pierson, who took these statements and subsequently incorporated them in their reports on the riot. The prosecuting attorney's discussions with inmates appear to have been trial preparation rather than investigative sessions. In light

of the disclosure to the defense of the remaining investigative records in this case, denial of access to these notes did not prejudice the defense's trial preparation. (*People* v. *Moore, supra,* 50 Cal.App.3d 989, 994.)

III*

. . . . . . . . . . . . . . . . . . . . . . . . . .

IV*

. . . . . . . . . . . . . . . . . . . . . . . . . .

V

 Appellant contends that the evidence does not support the jury verdict of conspiracy to commit murder. He concedes that substantial evidence supports the conviction for conspiracy to commit assault. Thus, he does not deny that the testimony of Lopez, Nelson and Guel that he donned heavy clothing before the incident, wielded a knife in the company of the other assailants, effectively blocked Nelson from escaping the attack of Bowden and others, directed other participants from a vantage point on the stairwell, and threw his knife out the window at the end of the riot, supports a reasonable inference that he acted in concert with the assailants. Appellant's position is that the jury could not reasonably infer that murder was an object of this conspiracy.

Appellant suggests that, as the only deaths occurred on the A side, he may only be convicted of conspiracy to commit murder if sufficient evidence ties him to those events. Commission of the target offense is not, however, an element of the crime of conspiracy. Here substantial evidence pertaining to the assaults on the B side supports the jury's conclusion that the conspirators' purpose was to kill, not merely to assault the victims. As direct evidence that the actors agreed to commit a particular offense is rarely available, the existence and nature of that agreement is commonly inferred from circumstantial evidence showing concerted conduct on the part of the defendant and other participants in furtherance of the alleged conspiratorial goal. (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 667-668 [47 Cal.Rptr. 788, 408 P.2d 116], cert. den. (1967) 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568]; *People* v. *Remiro* (1979) 89 Cal.App.3d 809, 843-844 [153 Cal.Rptr. 89], cert. den. 444 U.S. 876 [62 L.Ed.2d 104, 100 S.Ct. 160]; *People* v. *Lipinski* (1976) 65 Cal.App.3d 566, 575-576 [135 Cal.Rptr. 451]; *People* v. *Lauria* (1967) 251 Cal.App.2d 471, 475-478 [59 Cal.Rptr. 628].) The descriptions of the attacks which occurred on the B side indicate that each was directed toward producing death. The victims' lives were preserved only by their flight, their desperate attempts to shield themselves, and the eventual success of the correctional of-

---

*See footnote, *ante,* page 647.

ficers in restoring order. Nelson, Long and Myers were essentially "sandwiched" between groups of inmates approaching them from either direction on the second tier. This was not an incident in which acts of simple assault escalated into murderous combat. The assailants initiated their attack with deadly force, stabbing or attempting to stab the victims in the back, side, head and face. The attackers continued to stab the victims after their wounds had rendered them helpless. On at least two separate occasions, there were shouts that Nelson or Long should be killed. ■ Each act or statement of a conspirator in the perpetration of the crime is, of course, imputed to all the conspirators. (*People* v. *Booker* (1968) 263 Cal.App.2d 464, 472-473 [69 Cal.Rptr. 837].) ■ The same deadly purpose is reflected in the attacks upon Castaneda and Stacey. The jury's conclusion that the criminal agreement to which appellant was a party contemplated the deaths rather than the injuries of certain white and Mexican inmates was reasonable.

An appellate court may set aside a conviction for insufficiency of evidence only if "on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People* v. *Grimble* (1981) 116 Cal.App.3d 678, 686 [172 Cal.Rptr. 362]; see also *People* v. *Collins* (1975) 44 Cal.App.3d 617, 624 [118 Cal.Rptr. 864], disapproved on other grounds *People* v. *Cole* (1982) 31 Cal.3d 568 [183 Cal.Rptr. 350, 645 P.2d 1182].) A rational trier of fact could have found that the evidence pertaining to incidents on the B side establish beyond a reasonable doubt appellant's participation in a conspiracy to commit murder. (*Jackson* v. *Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781].)

VI

Defining the crime of conspiracy to commit murder, the court instructed the jury using a modified version of CALJIC No. 8.10 (1979 rev.): "The crime of murder is the unlawful killing of a human being with malice aforethought. The elements of the crime of murder are, one, that a human being was killed; two, that the killing was unlawful; and three, that the killing was done with malice aforethought.

"Therefore, the elements of the crime of conspiracy to commit murder are, one, an agreement that a human being be killed; two, the specific intent to enter into such an agreement; three, the specific intent that the human being be killed; and four, the mental state of malice be harbored by the persons entering into the agreement."

The court gave a conventional definition of malice aforethought based upon CALJIC No. 8.11 (1979 rev.) which included the following explication of "implied malice": "Malice is implied when a killing results from an act involv-

ing a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite such awareness."

The court did not instruct the jury concerning the different degrees of murder or the lesser offenses of voluntary and involuntary manslaughter. In sentencing appellant the court fixed the target offense of the conspiracy as first degree murder, declaring "the murder aspect [is] first degree by statute," and imposed the term prescribed for that crime, 25 years to life. Appellant makes two attacks on the court's instructions. He urges that *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], cert. den. (1982) 455 U.S. 922 [71 L.Ed.2d 464, 102 S.Ct. 1280], a case involving assault with intent to commit murder, bars delivery of implied malice instructions for conspiracy to commit murder. He also contends that under *People* v. *Horn* (1974) 12 Cal.3d 290 [115 Cal.Rptr. 516, 524 P.2d 1300], it was error to give no instructions defining the degrees of murder and describing its lesser included offenses. *Horn,* as it concerns the elements of conspiracy to commit murder, deserves our primary attention here.

Much of the confusion surrounding conspiracy to commit murder derives from the language of Penal Code section 182 itself: "If the felony is one for which different punishments are prescribed for different degrees, the jury or court which finds the defendant guilty thereof shall determine the degree of the felony defendant conspired to commit. If the degree is not so determined, the punishment for conspiracy to commit such felony shall be that prescribed for the lesser degree, except in the case of conspiracy to commit murder, in which case the punishment shall be that prescribed for murder in the first degree."

The California Supreme Court has rejected the theory that "any conspiracy to commit a homicide is, of logical necessity, a conspiracy to commit first degree murder." (*People* v. *Horn, supra,* 12 Cal.3d 290, 298.) *Horn* holds that section 182 does not relieve the court of the responsibility, which it would have in a prosecution for the substantive offense of first degree murder, of instructing the jury on the various pertinent grades of homicide and their elements. "Under Penal Code section 182 the jury must also determine which felony defendants conspired to commit, and if that felony is divided into degrees, which degree of the felony they conspired to commit. The jury cannot perform that task unless it is instructed on the elements of both the offense defendants are charged with conspiring to commit, and any lesser offense defendants asserts to be the true object of the conspiracy. [Fn. omitted.] [¶] . . . To determine whether the object of defendants' conspiracy in the present case was the commission of a first degree murder, the trier of fact obviously would need to know the elements of that offense." (*People* v. *Horn, supra,* 12 Cal.3d 290, 297-298; italics deleted.)

In *Horn,* the defendants offered evidence of intoxication at the time of the crime; the failure to instruct on voluntary manslaughter precluded the jury from determining whether, due to diminished capacity, the defendants were unable to entertain malice aforethought. (*People* v. *Horn, supra,* 12 Cal.3d 290, 300-301.) Accordingly, the Supreme Court reversed. In that case, failure to instruct on second degree murder was not error because of the defendant's intended use of a bomb in the contemplated homicide—in *Horn,* if the target offense was murder, it was necessarily first degree. (*People* v. *Horn, supra,* 12 Cal.3d 290, 300.) Ordinarily, however, conspiracy to commit second degree murder may be a lesser included offense of conspiracy to commit first degree murder: "As this language [in section 182] is written and punctuated, it plainly authorizes the trier of fact to return a verdict finding conspiracy to commit murder in the second degree." (*People* v. *Horn, supra,* 12 Cal.3d 290, 298, fn. 5.)

■ A court has a *sua sponte* obligation to instruct on lesser included offenses where evidence sufficient to " 'deserve consideration by the jury . . .' " suggests that an offense less than the one charged was committed. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 324 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].) ■ The instructions here did not identify the circumstances which can elevate a murder to first degree; thus the jury was not put to the task of finding all the elements of the offense of conspiracy to commit first degree murder. The only first degree factor applicable here is "wilful, deliberate, and premeditated killing." (Pen. Code, § 189.) The jury was told that guilt depended on a finding that appellant entered with specific intent into "an agreement that a human being be killed" and harbored the "specific intent that the human being be killed." A determination that a defendant has murdered with premeditation and deliberation requires more than a finding of a specific intent to kill. "In order for a murder to be first degree based upon a theory of premeditation and deliberation, the intent to kill must have been formed upon a preexisting reflection and must have been the subject of actual deliberation and forethought. [Citation.] A finding of first degree murder due to premeditation and deliberation is proper only when the slayer killed as the result of careful thought and weighing of considerations, as a deliberate judgment or plan, carried on cooly and steadily, especially according to a preconceived design." (*People* v. *Rowland* (1982) 134 Cal.App.3d 1, 7 [184 Cal.Rptr. 346]; see *People* v. *Smith* (1973) 33 Cal.App.3d 51, 64 [108 Cal.Rptr. 698], disapproved on other grounds *People* v. *Wetmore* (1978) 22 Cal.3d 318 [149 Cal.Rptr. 265, 583 P.2d 1308]; *People* v. *Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942].) Prejudice is particularly to be apprehended here as the prosecution produced no direct evidence of the participants' conspiratorial agreement. ■ One assenting to an agreement to kill does not, perhaps paradoxically, necessarily harbor the mental state of malice. (*People*

v. *Horn, supra,* 12 Cal.3d 290, 300-301.) Still more does it follow that the act of agreement does not by definition require the "careful thought and weighing of considerations" which is a prerequisite of premeditation and deliberation. (See *People* v. *Rowland, supra,* 134 Cal.App.3d 1, 7; see *People* v. *Fusselman* (1975) 46 Cal.App.3d 289 [120 Cal.Rptr. 282].)

■ An instruction concerning implied malice compounded the error. ■ Except where the felony murder rule is applicable, first degree murder must be predicated on express malice—the defendant must specifically intend to kill. (*People* v. *Heffington* (1973) 32 Cal.App.3d 1, 11 [107 Cal.Rptr. 859].) ■ *People* v. *Murtishaw, supra,* 29 Cal.3d 733, holds that it is error to give implied malice instructions where the offense or target offense charged is first degree murder. Even though the court correctly includes "intent to kill" among the elements of the crime itself, its instruction that the malice element may be based upon wanton conduct short of an intent to kill is contradictory and "may confuse the jury by suggesting that they can convict without finding a specific intent to kill." (*People* v. *Murtishaw, supra,* 29 Cal.3d 733, 765.) As *Horn* holds there does exist an offense of conspiracy to commit second degree murder, the error here lies not in the implied malice instruction but in the failure to distinguish between the degrees of murder and to instruct that implied malice is not sufficient to support a verdict of second degree murder. ■ Implied malice is not sufficient for attempted second degree murder. (*People* v. *Collie* (1981) 30 Cal.3d 43, 61-62 [177 Cal.Rptr. 458, 634 P.2d 534].) Nonetheless, this appears to be the most logical "route" to the crime of conspiracy to commit second degree murder recognized in *Horn. Horn* suggests there exists a conspiratorial offense to match each of the forms of homicide. (*Horn, supra,* 12 Cal.3d 290, 295-299.) ■ We must assume therefore the court contemplated agreements to commit wanton acts likely to cause death in recognizing conspiracy to commit second degree murder. ■ Where the evidence is susceptible to the interpretation that defendants manifested wanton disregard for human life and intended acts involving a high probability of death, the *Murtishaw* error is prejudicial. (*People* v. *Johnson* (1981) 30 Cal.3d 444, 449 [179 Cal.Rptr. 209, 637 P.2d 676].)

■ We cannot accept the Attorney General's submission that: "It is inconceivable, in view of the evidence, that the jury could have found appellant conspired to do anything other than intentionally kill other inmates." The suggested inference is not the only reasonable one. As there was no evidence of the conspirators' actual deliberations, the determination of what their shared intent and plan were necessarily rests on circumstantial evidence. The jury could reasonably have concluded that the events on B side more closely reflected the assailants' object than those on A. In other words, they could have determined the participants conspired to launch a vicious attack upon white and Mexican inmates and that they acted with wanton disregard of the probability that deaths

would occur as the result of the initial attacks themselves or of the racial riot which they would inevitably spark. Also the jury could have found that appellant joined in an agreement to kill but that his assent did not involve the degree of careful consideration necessary to sustain a conviction of conspiracy to commit first degree murder.

■ Appellant claims he was also entitled to a *sua sponte* instruction on mitigation of murder to voluntary manslaughter due to provocation. ■ Under *Horn,* voluntary manslaughter instructions are appropriate in a prosecution for conspiracy to commit murder where there is some question regarding the individual defendant's capacity to harbor the mental state of malice at the time of his entry into the conspiracy. (*People* v. *Horn, supra,* 12 Cal.3d 290, 300-301.) ■ Here, there was no evidence suggesting any provocation directed at appellant. Hence the court was under no duty to deliver voluntary manslaughter instructions.

■ Finally, appellant complains of the court's instructions on the intent necessary for conspiracy to commit assault upon an inmate. The court informed the jury that the instructions were to be read as a whole and that no instruction was to be accorded special weight relative to the others. Under the court's conspiracy instructions, it is clear that any conspiracy requires intent to enter into an agreement to commit the proscribed act. In discussing specifically the charged conspiracy to commit assault, the court informed the jury that it must find a union between the conduct—the conspiratorial agreement—and the specific intent to assault an inmate with a deadly weapon. The instructions applicable to the conspiracy to commit assault count alerted the jury as to each element of the offense and contained no internal inconsistencies. No error is seen.

■ An appellate court is not restricted to the remedies of affirming or reversing a judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial. (See Pen. Code, § 1260; *People* v. *Harris* (1968) 266 Cal.App.2d 426, 434-435 [72 Cal.Rptr. 423].) Such a modification of judgment is appropriate where there was error in failing to instruct on lesser included offenses but the evidence clearly establishes guilt of a lesser degree of the offense for which he was convicted. (*People* v. *Bailey* (1974) 38 Cal. App.3d 693, 700 [113 Cal.Rptr. 514].) ■ Consequently, as the Attorney General has properly suggested, the judgment here may be modified to reflect conviction for conspiracy to commit second degree murder and remanded to the trial court for appropriate resentencing.

Parts I, III and IV of this opinion are not published as those portions do not meet the standards for publication. (Cal. Rules of Court, rules 976(b) and 976.1.)

The judgment is modified by reducing the conviction of conspiracy to commit first degree murder to conspiracy to commit second degree murder. As so modified, the judgment is affirmed. The cause is remanded for resentencing.

Caldecott, P. J., and Poché, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 4, 1983.